**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT D. NELSON, Personal Representative of the Estate of DEREK BOOGAARD, Deceased,<br><br>        Plaintiff,<br><br>        v.<br><br>NATIONAL HOCKEY LEAGUE, NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and COMMISSIONER GARY B. BETTMAN, (collectively, "NHL"),<br><br>        Defendants. | No. _____ |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, for the reasons set forth below, Defendants National Hockey League ("NHL"), the National Hockey League Board of Governors and Commissioner Gary B. Bettman ("Bettman"), by their undersigned attorneys, file this Notice of Removal to remove the claims against them in this action from the Circuit Court of Cook County, Illinois, to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §§ 1367, 1441 and 1446.[1]

---

[1] "The National Hockey League Board of Governors," which Plaintiff has named as a defendant, is not an entity distinct from the NHL but is a group of representatives appointed by each NHL member Club that, under the NHL Constitution, governs the NHL and "establish[es] the policies of the League, and uphold[s] the Constitution and By-Laws[.]" Each Club's representative on the Board of Governors may vary from time to time, and each Club also designates a First Alternate Governor and a Second Alternate Governor. *See* NHL Constitution, Art. V. As the "Board of Governors" is not a legal entity with any existence apart from the NHL it cannot be a defendant in a legal action. *See DeGenova v. Sheriff of DuPage County*, 209 F.3d 973, 977 n. 2 (7th Cir. 2000) ("In Illinois, a defendant must have a legal existence, either natural or artificial, to be subject to suit.") Accordingly, the "Board of Governors" is not conceded to be a validly-named defendant in this proceeding but is named herein only for the purposes of removal.

Removal is made pursuant to 28 U.S.C. § 1331 on the basis of federal question jurisdiction.  The

grounds for removal are as follows:

## I.     INTRODUCTION AND BACKGROUND

1.     On June 5, 2013, the NHL and Bettman were served by plaintiff, Robert D.

Nelson, Personal Representative of the Estate of Derek Boogaard, with a Complaint (the

"Complaint") filed in the Circuit Court of Cook County, Illinois, No. 2013N-0001.  Copies of the

Complaint and other documents filed in this action are annexed as Exhibit A.

2.     The Complaint alleges that Derek Boogaard played in the NHL from 2005 to

2010, during which time he sustained numerous painful physical injuries, and became addicted

to and abused pain medications and sleeping pills.  (Compl. ¶¶ 2, 4, 5, 10, 11, 16-17).  The

Complaint alleges that the NHL owed a duty to keep Derek Boogaard "reasonably safe" and

breached its supposed duty by, among other things, failing to monitor Derek Boogaard's

prescriptions to prevent substance abuse and failing to establish proper procedures for

maintaining medical records, administering prescription pain medication and implementing

prescription drug monitoring programs.  (Compl. Count I, ¶¶ 68, 69 (b), (c), (d), (e), Count II, ¶¶

97, 98 (b), (c), (d), (e)).  The Complaint further alleges, among other things, that the NHL

breached its "assumed duty" to "curb, cure and monitor" Derek Boogaard's alleged "drug

addiction" by its alleged failures regarding the administration of the Substance Abuse and

Behavioral Health Program (hereinafter referred to as the "SABH Program"), which allegedly

"caused, or contributed to cause, Derek Boogaard's death as a result of accidental drug overdose

on May 13, 2011" and allegedly caused Derek Boogaard to suffer "personal and pecuniary

injuries, including conscious pain and suffering" prior to his death.  (Compl. Count III, ¶¶ 147

(a)-(h), 148, Count IV, ¶¶ 197 (a)-(h), 198).  The Complaint further alleges, among other things,

that the NHL drafted "Derek Boogaard to fight, on the ice, during games," and allegedly failed to

"warn Derek Boogaard of his increased risk of substance abuse," "warn Derek Boogaard and other NHL players of the consequences of playing through the concussions and/or their symptoms," "implement policies to prevent Derek Boogaard from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma," and "monitor and record Derek Boogaard's concussive head traumas during his NHL career." (Compl. Count V, ¶¶ 209 (a), (b), (e), (h), (k), Count VI, 221 (a), (b), (e), (h), (k)). The Complaint further alleges that the NHL breached its supposed duty to keep Derek Boogaard "reasonably safe" during his NHL career and "prevent brain trauma" by, among other things, allegedly "permitting numerous injections of Toradol," "failing to educate…[and] warn" Derek Boogaard and other NHL players of the health consequences and alleged risks of using Toradol. (Compl. Count VII, 242, 243 (a)-(e), Count VIII, 261, 262 (a)-(e)). The Complaint alleges, pursuant to the Survival Act of the State of Illinois, 755 ILCS 5/27-6, *et seq.*, causes of action for negligence. (Compl. Count I, ¶ 71, Count IV, ¶ 199, Count V, ¶ 212, Count VII, ¶ 245). The Complaint alleges, pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*, causes of action for negligence. (Compl. Count II, ¶ 101, Count III, ¶ 150, Count VI, ¶ 226, Count VIII, ¶ 267). Plaintiff seeks recovery of damages "for a sum in excess of the minimal jurisdictional limit for the Law Division for the Circuit Court of Cook County, Illinois. (Compl. pp. 13, 20, 29, 38, 41, 44, 48, 52, 53).

3.     Boogaard was employed by two NHL Member Clubs (not by the NHL itself) pursuant to terms and conditions of employment contained in the "2005 Collective Bargaining Agreement" and several other collectively-bargained agreements between the NHL and the National Hockey League Players' Association ("NHLPA") (collectively referred to hereinafter as the "CBA"). The CBA was the product of arm's-length negotiations between the NHL (the

exclusive bargaining representative of the present and future NHL member Clubs) and the

NHLPA (the exclusive bargaining representative of present and future NHL players). (CBA Art.

33.1). The CBA incorporates the SABH Program as the forum to address players' "substance

abuse" issues. (CBA Art. 47.3). The SABH Program itself is a product of collective bargaining

between the NHL and NHLPA, and, by its terms, "is deemed incorporated into the Collective

Bargaining Agreement." (SABH Program p. 1). The CBA (including but not limited to the

SABH Program) includes, among other terms, provisions relating to player substance abuse,

medical care and safety, and dispute resolution. The 2005 Collective Bargaining Agreement

(including exhibits and side letters) is annexed as Exhibit B. The SABH Program document is

annexed as Exhibit C. Relevant excerpts from the NHL Constitution and By-Laws, which the

NHLPA agreed are binding on all players (*see* 2005 CBA, Art. 30), are annexed as Exhibit D.[2]

The jointly-agreed Concussion Evaluation and Management Protocol and the 2008-09 Baseline

Testing Protocol of the NHL/NHLPA Concussion Working Group are attached as Exhibit E.

## II.    GROUNDS FOR REMOVAL

4.    This Court has original jurisdiction of this action under 28 U.S.C. § 1331 because

the action is one that is founded on a claim or right "arising under the Constitution, laws, or

treaties of the United States." A defendant may remove an action to federal court under 28

U.S.C. § 1441 if the complaint presents a federal question, such as a federal claim. *See Avco*

*Corp.* v. *Aero Lodge No. 735*, 390 U.S. 557, 560 (1968).

---

[2]  The 2005 Collective Bargaining Agreement provided, *inter alia*, that the League, Clubs and Players
agreed to be bound by the "League Playing Rules" and by the "League Rules" (CBA Art. 30). The
term "League Rules" was defined as the "Constitution and Bylaws, resolutions, rules, and regulations of
the NHL (other than [the 2005 CBA]) and/or any official interpretations of any of them" (CBA Art. 1).
The 2005 Collective Bargaining Agreement also provided that the NHL would not amend or modify
any provision of the League Rules affecting terms or conditions of employment without the NHLPA's
consent, which shall not be unreasonably withheld." (CBA Art. 30.3).

5. Federal question jurisdiction exists in this case based on complete preemption of plaintiff's claims under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. *See Sluder* v. *United Mine Workers of Am.*, 892 F.2d 549, 556 (7th Cir. 1989) ("[O]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law. . . . Thus, state-law claims preempted by Section 301 are properly removable to federal court despite a plaintiff's failure to plead explicitly a federal cause of action.").

6. Section 301 of the LMRA provides that the federal courts have original jurisdiction over all "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). The Supreme Court has held that "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 211 (1985); *see also Sluder* v. *United Mine Workers of America*, 892 F.2d 549, 555-56 (7th Cir. 1989) (holding that plaintiff's negligence claim was preempted because the claim "can be resolved only by defining the precise nature of the duty assumed by [Defendant], and that duty can be defined only by reference to the collective bargaining agreement"). Thus, Section 301 preempts tort claims seeking to vindicate "state-law rights and obligations that do not exist independently of [collective bargaining] agreements" and also claims "substantially dependent upon analysis of the terms of [a collective-bargaining] agreement." *Allis-Chalmers*, 471 U.S. at 213, 220; *Duerson v. NFL,* No. 12 C 2513, 2012 WL 1658353, at *6 (N.D. Ill. May 11, 2012) (holding that plaintiff's claims that the NFL negligently caused his Chronic Traumatic Encephalopathy ("CTE") and death by, among other things,

failing to treat and implement policies regarding players' ability to return to play following concussions were preempted by Section 301).

7.     Here, Plaintiff's claims are preempted by Section 301 because the rights Plaintiff seeks to vindicate were created by the CBA, and are not based on an independent duty "owed to every person in society." *See United Steelworkers of Am.* v. *Rawson*, 495 U.S. 362, 370-71 (1990) (holding in the context of a labor dispute involving unionized employees that, absent an independent duty running from defendants "to every person in society," any such duty to plaintiffs must arise out of the labor agreement); *see also Tifft* v. *Commonwealth Edison Co.*, 366 F.3d 513, 520 (7th Cir. 2004) (holding that plaintiffs' wrongful termination claims were preempted because the statute under which plaintiffs purported to bring the claims "does not provide the [p]laintiffs with rights independent of the CBA"). The CBA expressly delineates the obligations of the NHL with respect to both the promulgation and enforcement of playing rules for NHL Players, and as to evaluation and treatment of concussions and substance abuse. *See* ¶ 9, below, re NHL/NHLPA Competition Committee, Concussion Working Group and SABH Program.

8.     Plaintiff's claims also are preempted because those claims, and the scope of any duty owed by the NHL, are "inextricably intertwined with consideration of the terms of [the CBA]" or "substantially dependent" on an analysis of the relevant provisions of the CBA. *Allis-Chalmers*, 471 U.S. at 213, 215, 220; *see also Sluder*, 892 F.2d at 552 ("Plaintiffs' 'artfully pled' [negligence] claims are 'inextricably intertwined' with a construction of the collective bargaining agreement and thus preempted by Section 301 of the Labor Management Relations Act."); *Duerson*, 2012 WL 1658353, at *4 (holding that "[e]ven if the NFL's duty arises apart from the CBAs, therefore, the necessity of interpreting the CBAs to determine the standard of care still

leads to preemption"); *Brown v. Keystone Consol. Indus., Inc.*, 680 F. Supp. 1212, 1218 (N.D. Ill. 1988) (holding that plaintiffs' fraudulent misrepresentation claim was preempted because "any determination of plaintiffs' claim for fraudulent misrepresentation necessarily rests on an interpretation of the terms of the [labor] agreement"); *Stringer* v. *NFL*, 474 F. Supp. 2d 894, 909 (S.D. Ohio 2007) (wrongful death claim brought by decedent's widow against the NFL based on, among other things, the NFL's alleged failure to regulate adequately practices, games, equipment, and medical care to minimize the risk of heat-related illness, was preempted because the claim was "inextricably intertwined and substantially dependent upon an analysis of certain CBA provisions imposing duties on the clubs with respect to medical care and treatment of NFL players").

9.    Adjudicating Plaintiff's claims will hinge on interpretation of provisions of the CBA relating to player medical care and fitness to play, substance abuse and rule-making. *See, e.g.*:

- CBA Art. 16.11(e) ("Any determination that a Player is eligible to be placed on the Injured Reserve List, or designated as Injured Non-Roster, shall be made by the Club's physician in accordance with the Club's medical standards and documented…");

- CBA Art. 17.7 (establishing formal procedures that "will govern a determination of whether a Player is disabled and unable to perform his duties as a hockey Player for purposes of Paragraph 5 of the SPC [Standard Player's Contract]");

- CBA Art. 17.7; CBA Ex. 1 (Standard Player's Contract), ¶ 5 (a) – (n) (establishing procedures for physician to determine whether Player is "disabled or unable to perform his duties" under his contract);

- CBA Exs. 25-A to 25-C (Fitness to Play Determination Forms);

- CBA Art. 22 (establishing a joint NHL/NHLPA Competition Committee "for the purpose of examining and making recommendations associated with issues affecting the game and the way the game is played," including, but not limited to, issues relating to Playing Rules and equipment regulations and standards);

- CBA Art. 23.10 (requiring each Club to conduct an annual exit physical at the end of each NHL season and to document "all injuries that may require future medical or dental treatment either in the near future or post-career," and to provide each Player with a complete copy of his medical records following each season);

- CBA Art. 47 (establishing a jointly-administered Performance Enhancing Substances Program); *see generally* SABH Program (establishing the joint program as "a comprehensive effort to address substance abuse among NHL players and their families, to treat those with a substance abuse problem in a confidential, fair and effective way, and to deter such abuse in the future" and "seek[ing] to accomplish these goals through a coordinated program of education, counseling, inpatient and outpatient treatment, follow-up care, and, where appropriate, sanctions," which "has the full support of the [NHL] and the [NHLPA] and will be incorporated into the Collective Bargaining Agreement")[3];

- *see generally* Concussion Evaluation and Management Protocol (establishing a comprehensive protocol governing all phases of concussion evaluation and management in the NHL and the 2008-09 Baseline Testing Protocol, both agreed upon by the joint NHL/NHLPA Concussion Working Group ("CWG")); and

---

[3] The SABH Program was jointly created by arm's length negotiations between the NHL and NHLPA and is expressly incorporated into the 2005 CBA by its own terms and the terms of Article 47.3: "All other forms of 'substance abuse' and behavioral and domestic issues requiring employee assistance will continue to be handled through the NHL/NHLPA Program for Substance Abuse and Behavioral Health."

- NHL By-Law 17A ("Drug Audit"), which provides, in part that "Control of the acquisition and dispensing of prescription drugs by Member Clubs shall be maintained through compliance with the regulations established in this By-Law," and in the accompanying regulations of the NHL Prescription Medication Program, which provides detailed rules and forms for dispensation and administration of prescription drugs by NHL Member Clubs' doctors.

10.    The Complaint inaccurately asserts that the SABH Program was not collectively bargained. (Compl. ¶ 104) Indeed, that inaccurate allegation is at the core of the Plaintiff's claims; many allegations in the Complaint relate directly to the administration of the SABH Program. *See* Compl. ¶¶ 20, 105-147, 153-197.

11.    Courts considering wrongful death allegations brought by decedent athletes' families similar to those alleged here have determined that the plaintiffs' claims were substantially dependent on, and inextricably intertwined with, analysis of CBA provisions concerning medical care and treatment of players. *See Duerson,* 2012 WL 1658353, at *6; *Stringer*, 474 F. Supp. 2d at 911.

12.    This Court recently held that the NFL properly removed a complaint containing claims nearly mirroring those asserted here. *See Duerson,* 2012 WL 1658353, at *6 (denying plaintiff's motion to remand to state court because negligence claims were preempted, as they were "substantially dependent on the interpretation of CBA provisions").

13.    Although Plaintiff contends that his claims are not preempted because he and Len Boogaard, Joanne Boogaard, "next-of-kin of Derek Boogaard are not signatories to the NHL/NHLPA Collective Bargaining Agreement," (Compl. ¶ 34), and "[n]one of the claims by Derek Boogaard's heirs are governed by the terms of the 2005 Collective Bargaining

Agreement," (Compl. ¶ 35), it is well-settled that where, as here, the relationships between decedents and defendants are governed by collective bargaining agreements, the LMRA preempts wrongful death claims brought by estate representations or next-of-kin.  *See, e.g.*, *Rawson*, 495 U.S. at 362, 371 (wrongful death claims brought by the survivors of four deceased minors preempted where such claims "cannot be described as independent of the collective-bargaining agreement" because it was not a situation where defendants were "acting in a way that might violate the duty of reasonable care owed to every person in society."); *Zielke* v. *Int'l Bhd. Of Elec. Workers*, No. 95 CV 0618, 1998 WL 102565, at *4 (N.D. Ill. Feb. 24, 1998) (holding that the wrongful death claim brought by decedent's widow against union was preempted by the LMRA because "how[ever] [plaintiff] parses her claim, it is clear that [the union] was connected to [the decedent's] unfortunate death due to the relationship between them, which was founded on the collective bargaining agreement"); *Duerson*, 2012 WL 1658353, at *1, 6 (wrongful death claims brought by decedent's estate against the NFL preempted because the claims were "substantially dependent on the interpretation of CBA provisions").[4]

## III.   REMOVAL IS PROCEDURALLY PROPER

14.     The Northern District of Illinois is the federal district in which the Circuit Court of Cook County, Illinois—where Plaintiff filed his Complaint—is located.

15.     This Notice of Removal is timely under 28 U.S.C. § 1446(b), which states that "notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based."

---

[4] This Court can exercise supplemental jurisdiction over any claims it may find not to be preempted that arise out of the same set of factual circumstances.  28 U.S.C. § 1367.

16.     Written notice of the filing of this Notice of Removal will be provided to Plaintiff, and a copy of this Notice will be filed in the appropriate state court, as required by 28 U.S.C. § 1446(d).  This Notice of Removal is signed pursuant to Fed. R. Civ. Proc. 11.  *See* 28 U.S.C. § 1446(a).

17.     In filing this Notice of Removal, the NHL, the National Hockey League Board of Governors and Commissioner Gary B. Bettman do not waive any defenses that may be available, including, without limitation, jurisdiction, venue, standing, or procedures for the disposition of this action in accordance with the terms of the CBA.  Nor do the NHL, National Hockey League Board of Governors or Commissioner Gary B. Bettman admit any of the factual allegations in the Complaint; rather, the NHL, National Hockey League Board of Governors and Commissioner Gary B. Bettman expressly reserve the right to contest those allegations at the appropriate time.

WHEREFORE, the NHL, the National Hockey League Board of Governors and Commissioner Gary B. Bettman remove the above-captioned action brought against them in the Circuit Court of Cook County, Illinois.

Dated:  July 3, 2013

Respectfully submitted,

/s/ Paul L. Langer

PROSKAUER ROSE LLP
Paul L. Langer
*(Pro Hac Vice Applications to be filed)*
Joseph Baumgarten*
Howard Robbins*
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL  60602
(312) 962-3550

11

planger@proskauer.com
*Attorneys for the National Hockey League, National*
*Hockey League Board of Governors and*
*Commissioner Gary B. Bettman*

## CERTIFICATE OF SERVICE

The undersigned counsel for the National Hockey League, National Hockey League Board of Governors and Gary B. Bettman certifies that on this July 3, 2013, I caused a copy of the foregoing Notice of Removal to Federal Court to be mailed from my office at Three First National Plaza, 70 West Madison, Suite 3800, Chicago, IL 60602, as designated below, to the following addresses:

Thomas A. Demetrio
Rene A. Torrado, Jr.
William T. Gibbs
Corboy & Demetrio, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois 60602
(312) 346-3191
Firm No. 02329

/s/ Paul L. Langer