# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| ROBERT D. NELSON, Personal Representative of the Estate of DEREK BOOGAARD, Deceased | |
| Plaintiff, | |
| v. | Civil Action No. 13-cv-04846 |
| NATIONAL HOCKEY LEAGUE, NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and COMMISSIONER GARY B. BETTMAN, (collectively "NHL") | Honorable Judge Gary Feinerman |
| Defendants. | |

# MEMORANDUM OF LAW IN SUPPORT

# OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ....................................................................................................5

    A.     The NHL/NHLPA Collective Bargaining Agreement .............................................5

    B.     The Complaint ........................................................................................................9

ARGUMENT .......................................................................................................................11

I.     Plaintiff's Claims Are Preempted and Should Be Dismissed Because They Substantially Depend Upon Interpretation of the Terms of, or Arise Under, the CBA ..........................11

    A.     Plaintiff's Claims Substantially Depend Upon an Interpretation of CBA Provisions Concerning Player Health and Safety ...................................................14

    B.     Plaintiff's Claims Arise Under the CBA ................................................................19

    C.     Plaintiff's Preempted Claims Must Be Dismissed Due to the Failure to File a Timely "Hybrid" Section 301 Action ...................................................................19

II.     If Any of Plaintiff's Claims Are Not Preempted They Should Be Dismissed Based on the Exclusive-Remedy Provisions of the Illinois Workers' Compensation Act .....................22

III.     Claims Based on Injuries Allegedly Occurring Outside the Two-Year Limitations Period for Personal Injuries Should Be Dismissed ......................26

IV.     Plaintiff's Claims Should Be Dismissed for Failure to State a Claim as They Are Entirely Conclusory, and the Complaint Simply Names Commissioner Bettman as a Defendant, Which is Insufficient as a Matter of Law .........................................................................28

CONCLUSION ....................................................................................................................29

**Page(s)**

CASES

*Advincula v. United Blood Servs.,*
   176 Ill. 2d 1, 678 N.E.2d 1009, 223 Ill. Dec. 1 (Ill. 1996) ....................................................26

*Allis-Chalmers Corp. v. Lueck,*
   471 U.S. 202 (1985) ........................................................................................... 12, 13, 19

*American Express Co. v. Italian Colors Restaurant,*
   133 S. Ct. 2304, ___ U.S. ___ (2013) ..................................................................................21

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................................28

*Atwater v. National Football League Players Association,*
   626 F.3d 1170 (2010) ....................................................................................................18

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................................28

*Boogaard v. National Hockey League Players Association,*
   No. 2:12-cv-9128, 2013 WL 1164301 (C.D. Cal. Mar. 20, 2013) ........................................21

*Bowen v. United States Postal Service,*
   459 U.S. 212 (1983) ........................................................................................................13

*Brown v. National Football League,*
   219 F. Supp. 2d 372 (S.D.N.Y. 2002) ..................................................................................20

*Calvert v. Certified Grocers Midwest, Inc.,*
   No. 90-C-4020, 1991 WL 10047 (N.D.I11. Jan. 24, 1991) ..................................................12

*Caterpillar, Inc. v. Williams,*
   482 U.S. 386 (1987) ........................................................................................................12

*Conley v. Gibson,*
   355 U.S. 41 (1957) ............................................................................................................6

*DeGenova v. Sheriff of DuPage County,*
   209 F.3d 973 (7th Cir. 2000) .............................................................................................1

*DelCostello v. International Bhd. of Teamsters,*
   462 U.S. 151 (1983) ....................................................................................................20, 21

*Duerson v. National Football League,*
   No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) ........................................ passim

*Electrical Workers v. Hechler*,
    481 U.S. 852 (1987)......................................................................................................12

*Ervin v. OS Restaurant Servs., Inc.*,
    632 F.3d 971 (7th Cir. 2011) .......................................................................................21

*Givens v. Tennessee Football, Inc.*,
    684 F. Supp. 2d 985 (M.D. Tenn. 2010).................................................................4, 18

*Holmes v. Nat'l Football League*,
    939 F. Supp. 517 (N D. Tex. 1996) ..............................................................................18

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)............................................................................................28

*International Brotherhood of Electrical Workers v. Hechler*,
    481 U.S. 851 (1987)......................................................................................................14

*Janetis v. Christensen*,
    200 Ill. App. 3d 581, 558 N.E.2d 304, 146 Ill. Dec. 341 (Ill. 1990).........................26

*Jeffers v. D'Allessandro*,
    199 N.C.App. 86, 681 S.E.2d 405 (N.C. Ct. App. 2009)........................................4, 18

*Jung v. Ass'n of Am. Med. Colls.*,
    300 F. Supp. 2d 119 (D.D.C. 2004) .............................................................................28

*Laumann v. National Hockey League, et. al*,
    Nos. 12 Civ. 1817, 12 Civ. 3074, 2012 WL 6043225 (S.D.N.Y. Dec. 5, 2012) .......5

*Local 174, Teamsters of Am. v. Lucas Flour Co.*,
    369 U.S. 95 (1962).......................................................................................................12

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
    458 F. Supp. 2d 474 (E.D. Mich. 2006), *aff'd¸* 524 F.3d 726 (6th Cir. 2008).........28

*Mockbee v. Humphrey Manlift Co.*,
    973 N.E.2d 376 (Ill. App. Ct. 1st Dist. 2012) .......................................................22, 25

*National Hockey League v. National Hockey League Players' Association*,
    789 F.Supp. 288 (D. Minn. 1992)..................................................................................5

*NLRB v. City Disposal Sys., Inc.*,
    465 U.S. 822 (1984 .........................................................................................................6

*NLRB v. P.I.E. Nationwide, Inc.*,
    923 F.2d 506 (7th Cir. 1991) ..........................................................................................6

*Sherwin v. Indianapolis Colts, Inc.*,
  752 F. Supp. 1172 (N.D.N.Y. 1990) ............................................................4, 19, 20

*Sluder v. United Mine Workers of Am., Int'l Union*,
  892 F.2d 549 (7th Cir. 1989) ................................................................................12

*Stringer v. National Football League*,
  474 F. Supp.2d 894 (S.D.Ohio 2007) .............................................4, 16, 17, 18

*Textile Workers v. Lincoln Mills of Alabama*,
  353 U.S. 448 (1957) ............................................................................................12

*Tifft v. Commonwealth Edison Co.*,
  366 F.3d 513 (7th Cir. 2004) ..............................................................................12

*Unger v. Continental Assurance Co.*,
  461 N.E.2d 531 (1 Dist 1984), *aff'd*, 481 N.E.2d 684 (1985)..............................23

*United Parcel Service v. Mitchell*,
  451 U.S. 56 (1981)...............................................................................................21

*United Steel Workers of America v. Rawson*,
  495 U.S. 362 (1990).......................................................................................13, 20

*Vaca v. Sipes*,
  386 U.S. 171 (1967).............................................................................................20

*Williams v. Nat'l Football League*,
  582 F.3d 863 (8th Cir. 2009) ..............................................................................18

*Zielke v. Int'l Bhd. Of Elec. Workers*,
  No. 95 CV 0618, 1998 WL 102565 (N.D. Ill. Feb. 24, 1998)..............................13

**STATUTES & OTHER AUTHORITIES**

820 Ill. Comp. Stat. ...................................................................................................22

28 U.S.C. § 1367 ...................................................................................................4, 12

29 U.S.C. § 185 ............................................................................................................3

29 U.S.C. § 185(a) ............................................................................................ passim

Ill. Rev. Stat.1985, Chapter 110, Pars. 13-202 ......................................................26

740 ILCS 180/1, et seq...............................................................................................11

755 ILCS 5/27-6, et seq. ............................................................................................11

Fed.R.Civ.P. 8(a(2. ...................................................................................................................28

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Complaint in its entirety.[1]

## PRELIMINARY STATEMENT

Plaintiff's claims—that the National Hockey League ("NHL") breached a duty to regulate the sport of professional hockey to minimize the risk of concussions to Derek Boogaard ("Boogaard"), to prevent him from becoming addicted to controlled substances, and to aid in the treatment of his addiction— should be dismissed because they are preempted by federal labor law. If this Court were to find any of Plaintiff's claims not preempted, however, all such claims should be dismissed based on the exclusive-remedy provisions of the Illinois Workers' Compensation Act. In addition, the claims in Counts I, IV, V and VII of the Complaint should be dismissed, in whole or in part, as time-barred. Finally, Plaintiff's allegations should be dismissed because they are entirely conclusory and fail to state a claim against any of the defendants.

The Complaint alleges that throughout Boogaard's six-year career with two NHL Member Clubs — as a result of the NHL's alleged breach of a purported duty to keep him "reasonably safe during his NHL career and to refrain from causing an addiction to controlled substances" (Compl. ¶ 97) — Boogaard allegedly sustained painful physical injuries and

---

[1] "The National Hockey League Board of Governors," which Plaintiff has named as a defendant, is not an entity distinct from the NHL but is a group of representatives appointed by each NHL Member Club that, under the NHL Constitution, governs the NHL and "establish[es] the policies of the League, and uphold[s] the Constitution and By-Laws[.]" Each Club's representative on the Board of Governors may vary from time to time, and each Club also designates a First Alternate Governor and a Second Alternate Governor. *See* NHL Constitution, Art. V (attached as Exhibit 1 to the Declaration of Jessica Berman). As the "Board of Governors" is not a legal entity with any existence apart from the NHL, it cannot be a defendant in a legal action. See *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973, 977 n.2 (7th Cir. 2000) ("In Illinois, a defendant must have a legal existence, either natural or artificial, to be subject to suit.") Accordingly, the "Board of Governors" is not represented in this proceeding as a distinct defendant and this action should be dismissed as against the "Board of Governors."

concussions, became addicted to prescription pain medications, and died from an accidental prescription drug overdose on May 13, 2011. (Compl. ¶¶ 4, 16, 22, 99).

During Boogaard's career, he played in the NHL pursuant to the terms of a collective bargaining agreement between the NHL and his union, the National Hockey League Players' Association ("NHLPA"). The collective bargaining agreement includes not only the body of the document titled "Collective Bargaining Agreement" but also other collectively-bargained agreements setting forth terms and conditions of employment (as well as documents incorporated by reference in the Collective Bargaining Agreement), including, but not limited to, the NHL Constitution and By-Laws, League Resolutions and League Rules (which includes, *inter alia*, Playing Rules), policies of the NHL/NHLPA Concussion Working Group (including the Concussion Evaluation and Management Protocol and other documents relating to concussion evaluation and treatment), and the Substance Abuse and Behavioral Health Program ("SABH Program") (together, the "CBA").[2] The CBA is a labor agreement that details and comprehensively governs the relationship between the NHL, its Member Clubs, and its Players. Among other provisions, the CBA: (i) addresses the promulgation and review of Playing Rules and regulations, including those relating to Player safety; (ii) delegates to the NHL's Member Clubs and their medical staff the responsibility for diagnosing and treating concussions and other Player injuries, including making "fitness to play" decisions; (iii) establishes a comprehensive substance abuse evaluation and treatment program; (iv) provides for a Player's right to

---

[2] The 2005 Collective Bargaining Agreement provided, *inter alia*, that the League, Clubs and Players agreed to be bound by the "League Playing Rules" and by the "League Rules" (CBA Art. 30). The term "League Rules" was defined as the "Constitution and Bylaws, resolutions, rules, and regulations of the NHL (other than [the 2005 CBA]) and/or any official interpretations of any of them" (CBA Art. 1). The 2005 Collective Bargaining Agreement also provided that the NHL would not amend or modify any provision of the League Rules affecting terms or conditions of employment without the NHLPA's consent, "which shall not be unreasonably withheld ." (CBA Art. 30.3).

compensation and other benefits in the event of injury in the course of his employment as a hockey Player; and (v) sets forth the dispute-resolution procedures to be followed in the event of a dispute involving any provision of the CBA.

The CBA, like all collective bargaining agreements, is governed by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Section 301 ensures that labor disputes are resolved under a uniform body of federal labor law and adjudicated in accordance with the grievance procedures set forth in collective bargaining agreements. Thus, Section 301 completely preempts all state law claims — including tort claims — that are substantially dependent upon the terms of, or arise under, a collective bargaining agreement. Plaintiff's claims in the instant case are plainly preempted under these principles.

Plaintiff's state law claims are preempted by Section 301 because they are premised on, and require interpretation of, the terms of the CBA. Plaintiff's claims here are premised on allegations that the NHL had a duty to Boogaard to keep him "reasonably safe" during his NHL career, yet purportedly failed to warn him or NHL Member Clubs (or their physicians and other staff) of the risks of repeated concussions and of the risks of addiction to controlled substances and failed to monitor and treat Boogaard's drug use and addiction. (Compl. ¶ 97). These claims will require the Court to ascertain what duties, if any, the NHL owed to Boogaard, and the scope of those duties, to evaluate whether the NHL acted reasonably.

Because the CBA allocates responsibility for identifying and treating Player injuries generally — and evaluating and treating concussions and making "fitness-to-play" decisions specifically — to Member Clubs and their physicians, a court cannot make such an assessment in a vacuum; it must consider the scope of pre-existing duties delegated to NHL Member Clubs and their physicians under the CBA. Indeed, numerous courts have held that adjudication of similar

claims by former professional football players (or their estates) against the National Football League ("NFL") and NFL teams, seeking to impute to others the duties expressly prescribed in the NFL collective bargaining agreement, required interpretation of terms of that agreement and thus were preempted under Section 301.[3]  Similar provisions in the NHL's CBA, and similar claims in this case, should lead to the same result.

Plaintiff's claims against the NHL are preempted for the additional reason that they rest on purported obligations that arise under the CBA.  The crux of the Complaint is that the NHL failed to implement adequate rules and to take appropriate actions regarding concussions and substance abuse.  The CBA, however, expressly delineates the obligations of the NHL with respect to both the promulgation and enforcement of playing rules for NHL Players, and as to evaluation and treatment of concussions and substance abuse.

Accordingly, because Plaintiff's claims are completely preempted and Plaintiff cannot state a claim under Section 301 — having failed, as a federal court ruled in March 2013, to assert a timely "hybrid" Section 301 action for breach of contract against the NHL and of the duty of fair representation against the NHLPA — the Complaint should be dismissed in its entirety.

To the extent some, but not all, claims are preempted, the remaining claims are properly before this Court pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367 and should be dismissed based on the exclusive-remedy provisions of the Illinois Workers' Compensation Act ("WCA").  The WCA bars tort claims such as those asserted by Plaintiff against any organization that provides "safety service, advice or recommendations for the employer or [its] agents or employees." The very basis of the Complaint is the NHL's supposed

---

[3]  *See*, *e.g.*, *Duerson v. National Football League*, No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012);  *Givens v. Tennessee Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010); *Stringer*, 474 F. Supp. 2d at 909-11; *Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1177-79 (N.D.N.Y. 1990); *Jeffers v. D'Allessandro*, 199 N.C.App. 86, 95-96, 681 S.E.2d 405, 412 (N.C. Ct. App. 2009).

negligence in providing such safety service, advice and recommendations to NHL Member Clubs and to Boogaard.

The Survival Act claims in Counts I, IV, V and VII should be dismissed as time-barred because they are based on personal injuries Boogaard allegedly suffered more than two years prior to the filing of the Complaint on May 10, 2013 and, therefore, are outside the applicable statute of limitations.

Finally, all of Plaintiff's claims should be dismissed for failure to state a claim because his allegations are entirely conclusory. The Complaint invents duties that supposedly were owed to Boogaard by the NHL, and then points to alleged failures to meet these manufactured obligations. The claims against Commissioner Gary B. Bettman ("Bettman") are particularly implausible as Plaintiff has not pleaded any facts as to Bettman that, even if taken as true, state a claim for relief. Plaintiff does little more than name Bettman as a defendant, which is insufficient as a matter of law to survive a motion to dismiss.

## STATEMENT OF FACTS

The NHL is an unincorporated not-for-profit association of thirty Member Clubs that is dedicated to the perpetuation of hockey as one of the national games of the United States and Canada (Compl. ¶ 36); *National Hockey League v. National Hockey League Players' Association*, 789 F.Supp. 288, 289-90 (D. Minn. 1992); *Laumann v. National Hockey League, et. al*, Nos. 12 Civ. 1817, 12 Civ. 3074, 2012 WL 6043225 (S.D.N.Y. Dec. 5, 2012). Plaintiff is the Personal Representative of the Estate of Derek Boogaard. (Compl. ¶ 42.) Boogaard played hockey in the NHL from 2005 until his death in May of 2011. (*Id.* ¶ 2.)

### A.     The NHL/NHLPA Collective Bargaining Agreement

Boogaard was employed by two NHL Member Clubs (not by the NHL itself) pursuant to terms and conditions of employment contained in the "2005 Collective Bargaining Agreement"

and other collectively-bargained agreements between the NHL and the National Hockey League

Players' Association ("NHLPA") (as well as documents incorporated by reference in the

Collective Bargaining Agreement) that were operative during Boogaard's hockey career.[4]  The

CBA was the product of arm's-length negotiations between the NHL (the exclusive bargaining

representative of the present and future NHL Member Clubs) and the NHLPA (the exclusive

bargaining representative of present and future NHL Players).  (CBA Preamble).[5]

The CBA covers a broad range of subjects affecting the terms and conditions of

employment for NHL Players, including Player health and safety (including evaluation and

management of concussions and substance abuse) and grievance procedures for the resolution of

disputes under the CBA.

Among other requirements, the CBA delegates to the NHL's Member Clubs and their

medical staffs the responsibility for treating Player injuries, and places some responsibility on

Players themselves for the reporting and evaluation of injuries.  For example:

- CBA Article. 16.11(e) provides that "Any determination that a Player is eligible
  to be placed on the Injured Reserve List, or designated as Injured Non-Roster,
  shall be made by the Club's physician in accordance with the Club's medical
  standards and documented …."

---

[4] The 2005 Collective Bargaining Agreement is attached as Exhibit 2 to the Declaration of Jessica Berman.  In 2012, the NHL and NHLPA negotiated a successor agreement to the 2005 Collective Bargaining Agreement, but the 2012 Collective Bargaining Agreement is not at issue in this proceeding.

[5] A "collective bargaining agreement" includes not only the main document with that title but also other written and even oral agreements that are negotiated during the term of a labor contract.  *See, e.g., NLRB v. P.I.E. Nationwide, Inc.*, 923 F.2d 506 (7th Cir. 1991) (oral agreement was under the "rubric" of "collective bargaining agreement"), citing *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822 (1984) ("Collective bargaining is a continuing process.  Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract"), quoting *Conley v. Gibson*, 355 U.S. 41, 46 (1957).

- The CBA delegates to Club physicians the responsibility for making "fitness-to-play" determinations (as to whether a Player is disabled from playing). (CBA Art. 17.7; Standard Player's Contract ("SPC") ¶ 5).[6]

- The CBA provides that if a Player disagrees with the Club's doctor as to whether he is fit to play professional hockey or has a disabling injury, the Player has the right to obtain a second medical opinion within a certain timeframe. (CBA Art. 17.7; SPC ¶ 5).

- The CBA provides for each Club to conduct an annual exit physical at the end of each NHL season and to document "all injuries that may require future medical or dental treatment either in the near future or post-career," and to provide each Player with a complete copy of his medical records following each season. (CBA Art. 23.10).

- The form of "Standard Club Rules" that Clubs may provide to their Players is an exhibit to the CBA and provides, in part, that "[a]ll injuries and illnesses that impair a Player's ability to perform his duties as a hockey Player, must be reported immediately to the Club Trainer." (CBA Exh. 14).

The CBA also delineates the manner in which Playing Rules, including rules concerning and affecting Player safety, are promulgated and enforced. The CBA establishes a joint Competition Committee comprising five active Players designated by the NHLPA and five Club members designated by the NHL; the Competition Committee exists "for the purpose of examining and making recommendations [to the Board of Governors] associated with issues affecting the game and the way the game is played," including, but not limited to, issues relating

---

[6] The fitness-to-play provisions of CBA Section 17.7 are mirrored in Paragraph 5 of the form Standard Player Contract that is Exhibit 1 to the 2005 Collective Bargaining Agreement.

to Playing Rules, equipment regulations and standards, facility standards and scheduling of games. (CBA Art. 22).

Additionally, the CBA addresses the use and potential abuse of prescription drugs. The CBA incorporates the SABH Program as the forum for addressing Players' substance abuse and other behavioral issues. (CBA Art. 47.3). Contrary to the allegations of the Complaint (¶ 104), the SABH Program is, in fact, a product of collective bargaining between the NHL and NHLPA. By its terms, it "will be deemed incorporated into the Collective Bargaining Agreement." (SABH Program, p. 1).[7] The SABH Program provides, in part, that team doctors or other team personnel "may refer players to the [SABH] Program doctors for evaluation" and that team doctors may be involved "in the treatment and follow-up care process." (SABH Program, p. 4). The CBA also incorporates by reference NHL By-Law 17A ("Drug Audit"), which provides, in part that "Control of the acquisition and dispensing of prescription drugs by Member Clubs shall be maintained through compliance with the regulations established in this By-Law," and in the accompanying regulations of the NHL Prescription Medication Program, the interpretive guidelines to By-Law 17A which provide detailed rules and forms for dispensation and administration of prescription drugs by NHL Member Clubs' doctors. (*See* By-Law 17A and NHL Prescription Medication Program).[8]

In addition, since 1997, the joint NHL-NHLPA Concussion Working Group ("CWG") has agreed upon and issued mandates and guidance to Clubs and Players regarding the identification and management of concussions. This has included, among other elements, League-wide required baseline neuropsychological testing for all Players (and related

---

[7] The SABH Program document is attached as Exhibit 3 to the Declaration of Jessica Berman.

[8] By-Law 17A and the Prescription Medication Program are attached as Exhibits 4 and 5, respectively, to the Declaration of Jessica Berman.

authorization forms) to facilitate subsequent concussion evaluation and management. In addition, in January 2010, the CWG agreed upon and issued the 2009-10 Concussion Evaluation and Management Protocol ("Concussion Protocol") to Clubs' general managers, coaches, physicians, neuropsychologists and head athletic trainers. (*See* Jan. 10, 2010 Memorandum attaching 2009-10 Concussion Protocol; *see also* Aug. 20, 2008 memorandum from then-CWG Chair Dr. Ruben Echemendia and Player Introduction Form, Consent and Release Form and Confidentiality Agreement in connection with 2007 Neuropsychological Testing Program).[9] The Concussion Protocol defines concussions, requires (as in the past) baseline neuropsychological evaluations, sets minimum standards for evaluation and management of concussions, and places responsibility for fitness to play determinations with team physicians. (*See Id.; see also* CBA Section 17.7 and SPC ¶ 5*).*

Finally, the CBA provides for an exclusive dispute resolution procedure to address disputes of interpretation or application of the CBA, and a separate expedited dispute-resolution process for resolving fitness-to-play disputes, which are decided by doctors of the Club and the Player and, if necessary, through a third opinion from an independent physician. (CBA Art. 17.7(d)-(f); SPC ¶ 5).

### B. The Complaint

Plaintiff filed this action in the Circuit Court of Cook County on May 10, 2013. The Complaint alleges that Derek Boogaard played in the NHL from 2005 through 2010, during which time he sustained numerous painful physical injuries, and became addicted to and abused pain medications and sleeping pills. (Compl. ¶¶ 2, 4, 5, 10, 11, 16-17).

---

[9] The 2009-10 Concussion Evaluation and Management Protocol, the August 20, 2008 Echemendia memorandum and the 2007 Neuropsychological Testing Program forms are attached as Exhibits 6, 7 and 8, respectively, to the Declaration of Jessica Berman.

The Complaint alleges that the NHL owed a duty to keep Derek Boogaard "reasonably safe" and breached its supposed duty by, among other things, failing to monitor Derek Boogaard's prescriptions to prevent substance abuse and failing to establish proper procedures for maintaining medical records, administering prescription pain medication and implementing prescription drug monitoring programs. (Compl. Count I, ¶¶ 68, 69 (b), (c), (d), (e), Count II, ¶¶ 97, 98 (b), (c), (d), (e)). The Complaint further alleges that the NHL breached its "assumed duty" to "curb, cure and monitor" Derek Boogaard's alleged "drug addiction" by its alleged failures regarding the administration of the Substance Abuse and Behavioral Health Program (hereinafter referred to as the "SABH Program"), which allegedly "caused, or contributed to cause, Derek Boogaard's death as a result of accidental drug overdose on May 13, 2011" and allegedly caused Derek Boogaard to suffer "personal and pecuniary injuries, including conscious pain and suffering" prior to his death. (Compl. Count III, ¶¶ 147 (a)-(h), 148, Count IV, ¶¶ 197 (a)-(h), 198). The Complaint further alleges, among other things, that the NHL "drafted Derek Boogaard to fight, on the ice, during games," and allegedly failed to "warn Derek Boogaard of his increased risk of substance abuse," "warn Derek Boogaard and other NHL players of the consequences of playing through the concussions and/or their symptoms," "implement policies to prevent Derek Boogaard from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma," and "monitor and record Derek Boogaard's concussive head traumas during his NHL career," and "refrain from causing an addiction to controlled substances." (Compl. Count V, ¶¶ 97, 209 (a), (b), (e), (h), (k), Count VI, 221 (a), (b), (e), (h), (k)). The Complaint further alleges that the NHL breached its supposed duty to keep Derek Boogaard "reasonably safe" during his NHL career and "prevent brain trauma" by, among other things, allegedly "permitting numerous injections of Toradol," "failing

to educate…[and] warn" Derek Boogaard and other NHL players of the health consequences and alleged risks of using Toradol. (Compl. Count VII, 242, 243 (a)-(e), Count VIII, 261, 262 (a)-(e)). The Complaint asserts, in sum (*Id.* ¶ 223), that:

> If the NHL had taken the necessary steps to oversee and protect Derek Boogaard by warning him of the dangers of head traumas and by educating and training all persons involved with the NHL teams in the recognition, prevention and treatment of concussive brain injuries, Derek Boogaard would not have suffered dangerous repetitive head trauma; would have recovered more rapidly; would not have sustained permanent damage to his brain; would not have developed an addiction to prescription narcotics; and would not have overdosed causing his death.

The Complaint also asserts claims of negligence pursuant to the Survival Act of the State of Illinois, 755 ILCS 5/27-6, et seq. (Compl. Count I, ¶ 71, Count IV, ¶ 199, Count V, ¶ 212, Count VII, ¶ 245) and pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, et seq. (Compl. Count II, ¶ 101, Count III, ¶ 150, Count VI, ¶ 226, Count VIII, ¶ 267).

## ARGUMENT

Because Plaintiff's claims substantially depend upon an interpretation of the terms of, and/or arise under, the CBA, they are preempted, and should be dismissed. Alternatively, if any claims are found not to be preempted they should be dismissed based on the exclusive-remedy provisions of the Illinois Workers' Compensation Act. Plaintiff's claims in Counts I, IV, V and VII are also time-barred, in whole or in part, and subject to dismissal on that basis as well.

**I.  Plaintiff's Claims Are Preempted and Should Be Dismissed Because They Substantially Depend Upon Interpretation of the Terms of, or Arise Under, the CBA**

Plaintiff's state-law tort claims should be dismissed because they are preempted by Section 301 of the LMRA, 29 U.S.C. § 185(a), which concerns "[s]uits for violation of contracts between an employer and a labor organization representing employees."

Section 301 governs "claims founded directly on rights created by a collective bargaining agreement, and also claims 'substantially dependent upon analysis of a collective bargaining

agreement.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (*citing Electrical Workers v. Hechle*r, 481 U.S. 852, 859 n.3 (1987). *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220 (1985); *see also Tifft v. Commonwealth Edison Co.*, 366 F.3d 513, 516-17, 519-20 (7th Cir. 2004); *Sluder v. United Mine Workers of Am., Int'l Union*, 892 F.2d 549, 555-56 (7th Cir. 1989) ("The preemptive force of section 301 converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.") (internal quotation omitted). Thus, if resolution of Plaintiff's claims substantially depends on an interpretation of the terms of, or a claim arises under, the CBA, federal subject matter jurisdiction exists, and the state law claims must be dismissed. This Court can exercise supplemental jurisdiction over any claims it may find not to be preempted that arise out of the same set of factual circumstances. 28 U.S.C. § 1367; *Duerson v. National Football League*, No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012); *Calvert v. Certified Grocers Midwest, Inc.*, No. 90-C-4020, 1991 WL 10047, at *3 (N.D. I11. Jan. 24, 1991).

Section 301 is not merely jurisdictional; it has been interpreted to authorize federal courts to create a "body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers v. Lincoln Mills of Alabama*, 353 U.S. 448, 451 (1957). The logic for authorizing a body of federal "common law" to predominate over questions regarding collective bargaining agreements was best described by the Supreme Court in *Local 174, Teamsters of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962), in which the Court stated:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the bargain was made, the possibility of

conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation. . . .

*Id.* at 103-104.

Thus, any relationship created by collective bargaining agreements is defined and governed by the application of federal common law that is grounded in national labor policy and may not be interpreted under inconsistent state law. *See Bowen v. United States Postal Service*, 459 U.S. 212, 224-225 (1983). "[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

Plaintiff's state law negligence claims are all barred and should be dismissed under the preemption doctrine because the resolution of his claims necessarily involves the interpretation and analysis of provisions of the CBA. Although Plaintiff apparently anticipated this motion and asserts that the SABH Program is outside the CBA and that the CBA does not address health or safety issues (Comp. ¶¶ 29-35), that is demonstrably incorrect, as detailed above. (See pp. 6-7, *supra*).[10] Consequently, Plaintiff's claims are preempted by Section 301. *See United Steel Workers of America v. Rawson*, 495 U.S. 362, 369 (1990) (a state law tort action is preempted by

---

[10] Although the Complaint asserts that Plaintiff's claims are not preempted because he and Len Boogaard, Joanne Boogaard, "next-of-kin of Derek Boogaard are not signatories to any NHL/NHLPA Collective Bargaining Agreement," (Compl. ¶ 34), and "[n]one of the claims by Derek Boogaard's heirs are governed by the terms of the 2005 Collective Bargaining Agreement," (*Id.* ¶ 35), it is well-settled that where, as here, the relationships between decedents and defendants are governed by collective bargaining agreements, the LMRA preempts wrongful death claims brought by estate representations or next-of-kin. See, e.g., *Rawson*, 495 U.S. at 362, 371 (wrongful death claims brought by the survivors of four deceased minors preempted where such claims "cannot be described as independent of the collective bargaining agreement" because it was not a situation where defendants were "acting in a way that might violate the duty of reasonable care owed to every person in society."); *Duerson*, 2012 WL 1658353, at *1, 6 (wrongful death claims brought by decedent's estate against NFL preempted because claims were "substantially dependent on the interpretation of CBA provisions"); *Zielke v. Int'l Bhd. Of Elec. Workers*, No. 95 CV 0618, 1998 WL 102565, at *4 (N.D. Ill. Feb. 24, 1998) (holding that wrongful death claim brought by decedent's widow against union was preempted by LMRA because "how[ever] [plaintiff] parses her claim, it is clear that [the union] was connected to [the decedent's] unfortunate death due to the relationship between them, which was founded on the collective bargaining agreement").

Section 301 if the duty owed to the employee is created by the collective bargaining agreement and is without existence independent of the agreement). Plaintiff cannot evade the preemptive effect of Section 301 by re-casting breach of contract claims as sounding in tort. *See id; International Brotherhood of Electrical Workers v. Hechler*, 481 U.S. 851, 851 (1987) (plaintiff cannot avoid Section 301 preemption when, to determine validity of a state law tort claim, court must ascertain whether the implied duty of care arises from a collective bargaining agreement).

### A. Plaintiff's Claims Substantially Depend Upon Interpretation of CBA Provisions Concerning Player Health and Safety

All of Plaintiff's claims against the NHL are premised, at their core, on the NHL's alleged "duty to Derek Boogaard" to have kept him "reasonably safe" during his NHL career. (Compl. ¶ 97). Plaintiff contends that the NHL breached that supposed duty by, among other alleged acts and omissions, "[f]ailing to monitor and supervise its SABH Program" (Compl. ¶¶ 147.a, 197.a) and "[f]ailing to ensure rapid, accurate diagnosis of Derek Boogaard's concussive brain injuries during his playing career." (Compl. ¶¶ 209.f, 221.f). Those allegations plainly require interpretation of various health and safety provisions in the CBA.

The CBA contains numerous provisions that delegate certain responsibilities for the Player health and safety issues raised in the Complaint to NHL Member Clubs and the Clubs' physicians and other staff, as well as to the NHLPA or to Players themselves.

With respect to Plaintiff's allegation as to the NHL's supposed responsibility for "rapid, accurate diagnosis of . . . concussive brain injuries," under the 2005 CBA, the Club doctor is responsible for making fitness-to-play determinations as to all injuries, including concussions, and the Player has the right to contest that determination if he disagrees. *Id.* More specifically, the Concussion Protocol agreed upon between the NHL and NHLPA tasks Club doctors with

diagnosing concussions, and provides the doctors with information to assist them in that process. (*See* 2009-10 NHL Concussion Evaluation and Management Protocol).

As to the related allegation of a supposed NHL failure "to establish proper procedures for administering prescription pain medication" and "to implement or improve prescription drug monitoring programs" (Compl. ¶ 98.c, e), By-Law 17A ("Drug Audit") and the accompanying regulations in the Prescription Medication Program for the Athletic Training Room" are intended to "[e]nsure that appropriate standards . . . [are maintained] with regard to the control, inventory and management of prescription medications," and to "promote the security and safety of the players . . . as it relates to use of prescription medications in the athletic training room." (By-Law 17A and Prescription Medication Program, at 94). The Prescription Medication Program "requires each team to establish its own written guidelines as to how the goals and criteria of the NHL Prescription Medication Program will be met," and Club employees are required to report "any known or suspected misuse of abuse of any Medication." (*Id.* at 97, 101). Accordingly, these CBA provisions would have to be interpreted to determine the extent to which Member Clubs are obligated to establish procedures for administration and monitoring of Players' prescription drug use.

As these (and other) CBA provisions make clear, the resolution of Plaintiff's claims necessarily and substantially depends on an interpretation of the CBA. Plaintiff alleges that the NHL failed to "keep [him] reasonably safe" (Compl. ¶ 97) but, as discussed above, the CBA already delegates responsibility for management of concussions, dispensation and administration of prescription drugs, Player medical evaluations and fitness-to-play determinations. Thus, this Court cannot evaluate the duties purportedly owed by the NHL, the scope of those duties, or whether the NHL acted "reasonably" without considering these preexisting obligations regarding

Player health and safety imposed by the CBA.  For example, determining whether, as Plaintiff alleges, the NHL failed to act "reasonably" by "failing to implement policies to prevent Derek Boogaard from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma" (Compl. ¶ 209.h) would require interpretation of the CBA provision that assigns responsibility for making fitness-to-play determinations to Club doctors, and allows for Players to challenge those determinations through a second-opinion process detailed in the CBA.  (CBA Art. 17.7 SPC ¶ 5).  Specifically, this Court would have to determine what Club physicians are responsible for doing and what standards were applicable in order to determine what NHL conduct would be "reasonable" under the circumstances. *See Stringer*, 474 F. Supp. 2d at 910-11.

In sum, the NHL's alleged duty to keep Boogaard and other Players safe cannot be considered in a vacuum, but must be considered in light of the duties that the CBA contractually delegated to others.

The conclusion that Plaintiff's claims are preempted is supported by a long line of preemption precedent in the context of professional sports.

Numerous decisions have held that player injury claims that seek to impute to the National Football League ("NFL") or to NFL member clubs duties owed by others under the CBA are preempted because they require interpretation of CBA terms.  There is no reason why a different result should be reached regarding Plaintiff's claims against the NHL, where the NHL CBA is replete with provisions concerning the Player safety issues raised in the Complaint.

In *Duerson v. National Football League*, this Court held that negligence claims brought by the estate of former player David Duerson against the National Football League, based on Duerson's suicide allegedly resulting from brain damage incurred while playing in the NFL,

were preempted by Section 301. 2012 WL 1658353, at *2. As with Plaintiff's claims in the instant case, Duerson alleged that the NFL was negligent due to its

> failure to educate players about the risks of concussions and the dangers of continuing to play after suffering head trauma, failing to ensure rapid diagnosis and treatment of David Duerson's condition, and failing to implement policies to prevent David Duerson from returning to play with his injuries.

The Court concluded that Duerson's claims were preempted because numerous provisions of the applicable collective bargaining agreement concerned health and safety (including provisions regarding the duties of team doctors regarding fitness to play), and that "even if the NFL's duty arises apart from the CBAs . . . the necessity of interpreting the CBAs to determine the standard of care still leads to preemption." *Id.* at *5.

Similarly, in *Stringer v. National Football League,* the court held that a wrongful death claim against the NFL founded on allegations substantially similar to those advanced here was preempted under Section 301. *Stringer*, 474 F. Supp. 2d at 909-11. In *Stringer*, the widow of an NFL player, Korey Stringer, brought a wrongful death claim against the NFL (and others) after Stringer died from heatstroke suffered at training camp. *Id*. at 898. Like Plaintiff here, the *Stringer* plaintiff alleged that the NFL assumed a duty to its players, there, "to use ordinary care in overseeing, controlling, and regulating practices, policies, procedures, equipment, working conditions and culture of the NFL teams . . . to minimize the risk of heat-related illness," and the NFL breached this duty by "failing to establish regulations" to ensure "adequate care and monitoring of players suffering from heat-related illness" and "regulation of . . . return to practice." *Id*. at 899, 903-04.

Rejecting the plaintiff's arguments, the *Stringer* court determined that plaintiff's claim was preempted because the "question of whether the NFL was negligent" is "inextricably intertwined with certain key provisions of the CBA." 474 F. Supp. 2d at 910. Specifically, and

among other reasons, the court found that because the CBA "places primary responsibility" for treating the players' physical condition on the team physicians, the CBA provisions doing so "must, therefore, be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances." *Id*. at 910-11. The court thus held that, even if the NFL had voluntarily assumed a duty, "the degree of care owed cannot be considered in a vacuum" but instead "must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players." *Id*. at 910. As set forth below, the same is true here with respect to the NHL and the source of any alleged duties to Plaintiff. *See also Givens*, 684 F. Supp. 2d at 990-91 ("[W]hether a physician's failure to advise a player of his medical condition should be imputed to the club or whether the club has a duty independent of the physician to advise a player of his medical condition, are 'inextricably intertwined' with the provisions of the CBA."); *Jeffers*, 199 N.C.App. at 95-96 (former NFL player's claims against Club — that team physician performed unauthorized procedures during knee surgery — preempted because the claim was substantially dependent on an analysis of CBA provisions setting forth the Clubs' and players' rights and duties in connection with medical care); *see also Williams v. Nat'l Football League*, 582 F.3d at 881 (negligence claim against the NFL preempted because "whether the NFL . . . owed the Players a duty to provide . . . a warning [that a supplement contained a banned substance under the NFL Drug Policy] cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy"); *Atwater v. Nat'l Football League* , 626 F.3d at 1182 (former players' claims preempted because court "would … have to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL"); *Holmes v. Nat'l Football League*, 939 F. Supp. 517, 519, 528 (N D. Tex. 1996) (claims of fraudulent

inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy preempted).

**B.      Plaintiff's Claims Arise Under the CBA**

Plaintiff's claims against the NHL are preempted by Section 301 for the additional reason that the duty the NHL supposedly breached arises out of the CBA.  *See Allis-Chalmers*, 471 U.S. at 213.  As the Complaint makes clear, Plaintiff's claims are based on the NHL's purported failure to implement adequate "rules," "procedures," "regulat[ions]" and "protocols" regarding Player health and safety (*see, e.g.*, Compl. ¶¶ 98.c, 98.d, 209.g, 209.j, 221.g, 221.j) and its supposed failure to "monitor and supervise its SABH Program."  (Compl. ¶¶ 147.a, 197.a).  It is under the CBA, however, that the NHL and NHLPA agreed to "establish a Player/Club Competition Committee … for the purpose of examining and making recommendations associated with issues affecting the game and the way the game is played."  (CBA Art. 22.1) This mandate includes recommendations regarding, among other issues, "the development, change, and enforcement of Playing Rules" and "Player equipment regulations and standards." (*Id.*)  Recommendations by the Competition Committee can become effective only if approved by the NHL Board of Governors.  (CBA Art. 22.6).  Likewise, the SABH Program, contrary to Plaintiff's assertion, is part of the CBA.  Thus, the many allegations of shortcomings in the administration of the SABH Program demonstrate that the NHL's alleged duty to have kept Boogaard "reasonably safe" arises under the CBA. Because the alleged duty that Plaintiff claims was breached arises out of the CBA, Plaintiff's claims are preempted.  *See, e.g., Sherwin*, 752 F. Supp. at 1177-78 (former player's claims that Club provided negligent medical treatment and fraudulently concealed the extent of the player's injury preempted because Club "did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the" NFL collective bargaining agreement).

19

That the NHL's purported obligation arises under the CBA is confirmed by the fact that the duty does not exist independent of the CBA: The NHL obviously does not owe duties to promulgate rules regarding NHL Player health and safety to "every person in society," as the rest of the public are not NHL Players.  *See Rawson*, 495 U.S. at 371 (holding a state law right only arises outside of a CBA where defendant is "accused of acting in a way that might violate the duty of reasonable care owed to every person in society"); *Brown v. Nat'l Football League* , 219 F. Supp. 2d at 380 ("To be independent of the CBA, a tort claim must allege a violation of a duty 'owed to every person in society' as opposed to a duty owed only to employees covered by the collective bargaining agreement" (quoting *Rawson*, 495 U.S. at 362)); *Sherwin*, 752 F. Supp. at 1178 (finding fraud claim arose under CBA because "[t]he Colts owed a duty to . . . provide truthful information regarding medical treatment . . . only to their players covered by the standard player agreement and the CBA," not "to every person in society").

*     *     *     *

In sum, Plaintiff's claims substantially depend upon an interpretation of the terms of the CBA and also actually arise under the CBA and, therefore, are preempted.

### C. Plaintiff's Preempted Claims Must Be Dismissed Due to the Failure to File a Timely "Hybrid" Section 301 Action

As Plaintiff's claims are preempted by Section 301, they must also be dismissed because Boogaard — having failed timely to file a "hybrid" Section 301 claim — cannot state a claim under the LMRA.

Where a collective bargaining agreement provides for arbitration of disputes between the union and the employer concerning the requirements of the agreement, an individual union member cannot ordinarily bring an independent lawsuit for violation of the agreement.  In *Vaca v. Sipes*, 386 U.S. 171, 186 (1967), and *DelCostello v. International Bhd. of Teamsters*, 462 U.S.

151, 165 (1983), the U.S. Supreme Court recognized a narrow exception to this bar against lawsuits by individual union members. Such "hybrid/duty of fair representation" actions are permissible under Section 301 only where the employee represented by the union can demonstrate both (1) that the union breached the duty of fair representation in handling the grievance, and (2) that the employer in fact breached the terms of the collective bargaining agreement. *DelCostello*, 462 U.S. at 164-65. As the Supreme Court explained in *DelCostello*, "the two claims are inextricably interdependent." 462 U.S. at 165. Proof that the union breached its duty of fair representation is an "indispensable predicate" to the plaintiff's breach of contract claim. *United Parcel Service v. Mitchell*, 451 U.S. 56, 62 (1981).

A federal district court has already ruled, however, that Boogaard failed to file a hybrid Section 301 action within the applicable statute of limitations. *Boogaard v. National Hockey League Players Association*, No. 2:12-cv-9128, 2013 WL 1164301, at *3-5 (C.D. Cal. Mar. 20, 2013) (dismissing Section 301 claim, holding that Boogaard failed to file action within six-month limitations period following notice that NHLPA would not be pursuing a grievance against the NHL).[11]

To the extent, however, that any claim is not preempted, supplemental jurisdiction exists over such claims. *Ervin v. OS Restaurant Servs., Inc.*, 632 F.3d 971, 979 (7th Cir. 2011).

---

[11] Only last week, the Supreme Court reaffirmed the broad enforceability of arbitration agreements in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, ___ U.S. ___ (2013) (small size of individual claim did not excuse failure to pursue arbitration; class-action waiver was enforceable).

**II.      If Any of Plaintiff's Claims Are Not Preempted They Should Be Dismissed Based on the Exclusive-Remedy Provisions of the Illinois Workers' Compensation Act**

If this Court were to find any of Plaintiff's claims not to be preempted by Section 301, those claims should be dismissed in any event because they would be barred by the exclusive-remedy provision of the Illinois Workers' Compensation Act ("WCA").[12]

Section 5(a) of the WCA bars negligence actions not only against a plaintiff's employer but also against organizations that provide "safety service, advice or recommendations" to the employer or its employees, which is *exactly* the role that Plaintiff asserts the NHL to have played.  Section 5(a) provides, in relevant part:

> No common law or statutory right to recover damages from the employer, his insurer, his broker, any service organization retained by the employer, his insurer or his broker to provide safety service, advice or recommendations for the employer or the agents or employees of any of them for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act, to any one wholly or partially dependent upon him, the legal representatives of his estate, or any one otherwise entitled to recover damages for such injury.

820 Ill. Comp. Stat. 305/5(a).

Illinois courts have interpreted "service organization" within the meaning of Section 5(a)'s exclusive-remedy provision to be a broad term that includes "any organization that provides 'safety service, advice, or recommendations for the employer'," regardless of whether it contributes to workers' compensation coverage, the nature of its ties to the employer-employee relationship, or whether it is compensated for the services it provided.  *Mockbee v. Humphrey Manlift Co.*, 973 N.E.2d 376, 389 (Ill. App. Ct. 1st Dist. 2012) (concluding that contractor that

---

[12] Defendants assume the applicability of Illinois law for the purposes of this motion to dismiss, but do not concede that Illinois law should apply to this action under a choice of law analysis.

allegedly was negligent in performing safety surveys of manlift platforms was a "service organization" insulated from suit under the exclusive-remedy provision of Section 5(a)).

The Complaint plainly alleges that the NHL was responsible for providing safety services, advice and recommendations to NHL Clubs that employed Boogaard, as well as to Boogaard himself. Indeed, Plaintiff's theory of recovery against the NHL is that it was negligent in rendering such safety services, advice and recommendations to Clubs and to Players, and that Boogaard's injuries and death arose out of his employment (and thus were compensable under the WCA). *See, e.g., Unger v. Continental Assurance Co.*, 461 N.E.2d 531 (1 Dist 1984), *aff'd*, 481 N.E.2d 684 (1985) (compensable "line of duty" injuries are those which arise out of and in the course of employment).

The Complaint's allegations as to the NHL's supposed breaches of its duty to Boogaard are simply a litany of assertions as to the NHL's failure to provide any or adequate safety services, advice and recommendations to Clubs that employed Boogaard and to Boogaard himself with respect to his safety and that of other Players. In particular, the Complaint alleges that the NHL breached its supposed duty by:

- "Failing to warn Derek Boogaard of the increased risk of substance abuse due to his role as an Enforcer/Fighter" (¶ 98.a);
- "Failing to monitor Derek Boogaard's prescriptions to prevent substance abuse" (¶ 98.b);
- "Failing to establish proper procedures for administering prescription pain medication to Derek Boogaard from NHL affiliated team physicians, dentists, trainers and staff" (¶ 98.c);
- "Failing to establish proper procedures for maintaining Derek Boogaard's medical records and sharing those records with NHL affiliated team physicians, dentists, trainers and staff" (¶ 98.d);
- "Failing to implement or improve prescription drug monitoring programs ("PDMPs"), which are electronic databases that track all prescriptions for painkillers in the League" (¶ 98.e);
- "Failing to utilize PDMP and/or insurance plan data to identify multiple, duplicative prescriptions for painkillers" (¶ 98.f);
- "Failing to set up program plans that identify and address improper player use of painkillers" (¶ 98.g);

- "Failing to set up prescription claims review programs to identify and address multiple, duplicative prescriptions and use of painkillers" (¶ 98.h);
- "Failing to monitor and supervise its SABH Program" (¶¶ 147.a, 197.a), which "was created to establish a league-wide program to address substance abuse, HIV, and related health matters for NHL players" (¶¶ 106, 156);
- "Failing to place Derek Boogaard in the SABH Program [sic] defined four stages of intervention" (¶¶ 147.b, 197.b);
- "Failing to intervene when necessary to treat Derek Boogaard for substance abuse" (¶¶ 147.c, 197.c);
- "Failing to appropriately treat Derek Boogaard for substance abuse" ¶¶ (147.d, 197.);
- "Failing to ensure rapid, accurate diagnosis and intervention for Derek Boogaard's relapse of prescription pain pill abuse" (¶¶ 147.e, 197.e);
- "Failing to adequately monitor Derek Boogaard for prescription pain pill abuse following his discharge from "The Canyon" rehabilitation facility" (¶¶ 147.f, 197.f);
- "Failing to warn Derek Boogaard of the increased risk of fatal overdose following his release from the ARC" (¶¶ 147.g, 197.g);
- "Failing to monitor Derek Boogaard upon release from the ARC" (¶¶ 147.h, 197.h);
- "Drafting Derek Boogaard to fight, on the ice, during games" (¶¶ 209.a, 221.a);
- "Failing to warn Derek Boogaard of his increased risk of substance abuse" (¶¶ 209.b, 221.b);
- "Encouraging Derek Boogaard to fight during NHL games" (¶¶ 209.c, 221.c);
- "Failing to warn Derek Boogaard and other NHL players of the potential long-term impact of suffering numerous concussive head traumas" (¶¶ 209.d, 221.d);
- "Failing to warn Derek Boogaard and other NHL players of the consequences of playing through the concussions and/or their symptoms" (¶¶ 209.e, 221.e);
- "Failing to ensure rapid, accurate diagnosis of Derek Boogaard's concussive brain injuries during his playing career" (¶¶ 209.f, 221.f);
- "Failing to establish bench concussion assessment protocol [sic] to assist team physicians and trainers in their initial assessment of brain trauma" (¶¶ 209.g, 221.g);
- "Failing to implement policies to prevent Derek Boogaard from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma" (¶¶ 209.h, 221.h);
- "Failing to require that Derek Boogaard be cleared both by a team physician and by an independent neurological or neuro-physiological consultant prior to resuming hockey activities after suffering a concussion" (¶¶ 209.i, 221.i);
- "Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by Derek Boogaard" (¶¶ 209.j, 221.j);
- "Failing to monitor and record Derek Boogaard's concussive head traumas during his NHL career" (¶¶ 209.k, 221.k);
- "Permitting numerous injections of Toradol to mask the pain Derek Boogaard felt while playing as an Enforcer/Fighter in the NHL" (¶¶ 243.a, 262.a);
- "Failing to educate players, including Derek Boogaard, coaches and medical professionals about the risks associated with Toradol" (¶¶ 243.b, 262.b);

- "Failing to warn Derek Boogaard and other NHL players of the potential long-term effects of Toradol, and/or brain damage after injection with Toradol" (¶¶ 243.c, 262.c);
- "Failing to warn Derek Boogaard and other NHL players of the consequences of playing hockey while under the effects of Toradol" (¶¶ 243.d, 262.d);
- "Failing to warn Derek Boogaard and other NHL players of the increased risk of suffering even greater damages due to concussions because of Toradol's blood thinning effect" (¶¶ 243.e, 262.e); and that
- "If the NHL had taken the necessary steps to oversee and protect Derek Boogaard by warning him of the dangers of head traumas and by educating and training all persons involved with the NHL teams in the recognition, prevention and treatment of concussive brain injuries, Derek Boogaard would not have suffered dangerous repetitive head trauma; would have recovered more rapidly; would not have sustained permanent damage to his brain; would not have developed an addiction to prescription narcotics; and would not have overdosed causing his death." (¶ 223). *See also* Compl. ¶ 264 (same as ¶ 223 except concerning the NHL's alleged failure to warn Boogaard of the risks of Toradol, a pain medication).

These allegations place the NHL squarely within the protections of Section 5(a)'s exclusive-remedy provision. The Complaint asserts—paralleling Section 5(a)—that the NHL should have provided Boogaard and his employing Clubs with advice and recommendations concerning safety issues such as concussions, drug usage and addiction, recordkeeping and monitoring of drug use and administration, and performing safety services such as establishing procedures concerning concussion assessment and administration of prescription drugs. As in *Mockbee*, the assertion that the defendants were "negligent in providing the qualifying service, advice, and recommendations" is Plaintiff's very theory of recovery. 973 N.E.2d at 390. Thus, there is "no room for ambiguity in Section 5(a)" that would permit tort actions against the NHL, which is plainly a "service organization" within the meaning of the WCA. *Id.*

Accordingly, if any of Plaintiff's claims are found not to be preempted, they should be dismissed as barred by the exclusive-remedy provision of the WCA.

### III. Claims Based on Injuries Allegedly Occurring Outside the Two-Year Limitations Period for Personal Injuries Should Be Dismissed

Even if not preempted by Section 301 or subject to dismissal based on the WCA, numerous claims in the Complaint should be dismissed as time-barred. Plaintiff's Survival Act claims in Counts I, IV, V and VII should be dismissed, in whole or in part, as untimely because they concern injuries that allegedly occurred outside the two-year statute of limitations applicable to negligence claims for personal injuries under Illinois law. (Ill. Rev. Stat.1985, Ch. 110, Pars. 13-202) A claim under the Survival Act is a derivative one; it is brought by the decedent's representative but based on the injury to the decedent. *See Advincula v. United Blood Servs.,* 176 Ill. 2d 1, 678 N.E.2d 1009, 1029, 223 Ill. Dec. 1 (Ill. 1996). The controlling date for triggering the statute of limitations is the date upon which the decedent learned of his injury. *See Advincula*, 678 N.E.2d at 1029; *Janetis v. Christensen*, 200 Ill. App. 3d 581, 558 N.E.2d 304, 309, 146 Ill. Dec. 341 (Ill. 1990).

The Complaint in this action was filed on May 10, 2013, just three days short of two years after Boogaard's death on May 13, 2011. (Compl. ¶ 25).

Plaintiff's claim in Count I—asserting that due to the NHL's alleged "negligent acts or omissions, Derek Boogaard suffered personal and pecuniary injuries in the form of addiction, which caused conscious pain and suffering and loss of a normal life, prior to his death on May 13, 2011" (Compl. ¶ 70) — is time-barred and should be dismissed in its entirety. Boogaard was admitted to a drug treatment program on September 23, 2009 "for in-patient treatment of his developed opioid and sleeping pill addiction." (Compl. ¶ 13). Thus, Boogaard plainly knew of his addiction to prescription medications no later than September 23, 2009, more than two years

prior (indeed, nearly four years prior) to the filing of the Complaint. Accordingly, Count I should be dismissed as time-barred.

The claim in Count IV—alleging breach of duty to monitor "curb, cure and monitor Derek Boogaard's drug addiction" (Compl. ¶ 195) — should be dismissed as to alleged injuries of which Boogaard was aware more than two years prior to the filing of the Complaint, *i.e.*, prior to May 10, 2011. As this action was filed just three days less than two years following Boogaard's death, the vast majority of the allegations in the Complaint concern injuries and suffering due to drug addiction that allegedly occurred outside the limitations period. This Court should dismiss the claim in Count IV of the Complaint as to those time-barred injuries.

This Court should dismiss in its entirety Count V of the Complaint, which alleges negligence in failure to monitor Boogaard for brain trauma during his playing career. (Compl. ¶ 209). As Boogaard's playing career ended with his last NHL hockey game on December 9, 2010 (Compl. ¶ 240) — more than two years prior to the filing of this action — any alleged failure to monitor Boogaard's brain trauma during his playing career should be dismissed as time-barred.

Likewise, Count VII of the Complaint, which alleges negligence in the administration of the pain medication Toradol during Boogaard's career, should be dismissed in its entirety. (Compl. ¶ 243). The Complaint alleges that Boogaard was last administered Toradol on December 3, 2010, more than five months outside the limitations period. (Compl. ¶ 228).

Accordingly, if not otherwise held to be preempted or subject to dismissal based on the WCA, Plaintiff's claims in Counts I, IV, V and VII of the Complaint should be dismissed as demonstrated above.

**IV.** **Plaintiff's Claims Should Be Dismissed for Failure to State a Claim as They Are Entirely Conclusory, and the Complaint Simply Names Commissioner Bettman as a Defendant, Which is Insufficient as a Matter of Law**

Beyond the grounds for dismissal demonstrated above, Plaintiff's claims should all be dismissed because the Complaint's allegations are entirely conclusory. As against NHL Commissioner Gary B. Bettman, in particular, the Complaint does little more than name him as a defendant; there are simply no allegations even suggesting that Bettman could be liable for any claims. To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2.) "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true ... 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Each Defendant is entitled to a determination as to whether Plaintiff states a claim against it individually. *See Twombly*, 550 U.S. at 564 n.10; *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 485 (E.D. Mich. 2006) (use of collective term "defendants" to apply to numerous parties is insufficient to state a claim that each defendant participated in an alleged conspiracy), *aff'd¸* 524 F.3d 726 (6th Cir. 2008); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (allegations of agreement "without any specification of any particular activities by any particular defendant" do not meet the standard set forth in *Twombly*); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004) (dismissing defendant from complaint, and holding that "[p]laintiffs cannot escape their burden of alleging that each defendant participated in or agreed to join the conspiracy by using the term

'defendants' to apply to numerous parties without any specific allegations as to" the dismissed defendant).

The allegations in the Complaint, though voluminous, are entirely conclusory. The Complaint is replete with allegations that the NHL had an "assumed duty" to have "taken the necessary steps to oversee and protect Derek Boogaard" from various risks on and off the ice. (Compl. ¶¶ 223, 264). Aside from asserting such a duty and failures to fulfill it, there are no factual assertions in the Complaint that make any of the allegations "plausible on its face." Perhaps most glaringly, other than asserting that Bettman and the Board of Governors "meet regularly to determine issues of player safety and the care the players receive when in the NHL" (Compl. ¶ 41), there are no allegations whatsoever of acts or omissions by Bettman.

Accordingly, Plaintiff's claims—if not otherwise dismissed based on the grounds discussed above—should be dismissed for failure to state a claim.

## CONCLUSION

For the reasons set forth above, Defendants respectfully submit that the Complaint should be dismissed in its entirety.

Dated: July 10, 2013            Respectfully submitted,

           */s/ Paul L. Langer*
           Paul L. Langer (IL Bar No. 6189216)
           PROSKAUER ROSE LLP
           Three First National Plaza
           70 W. Madison St., Ste. 3800
           Chicago, IL 60606
           Telephone: (312) 962-3550
           planger@proskauer.com

           Joseph Baumgarten*
           Howard Robbins*
           PROSKAUER ROSE LLP

Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
jbaumgarten@proskauer.com
hrobbins@proskauer.com

*Attorneys for Defendants*

*\*Pro Hac Vice Applications to be filed*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via the Court's CM/ECF system on this 10th day of July, 2013.

*/s/ Paul L. Langer*
Paul L. Langer