UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT D. NELSON, Personal Representative of the Estate of DEREK BOOGAARD, Deceased, | ) ) ) 13 C 4846 |
| Plaintiff, | ) ) Judge Feinerman |
| vs. | ) ) |
| NATIONAL HOCKEY LEAGUE, NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and COMMISSIONER GARY B. BETTMAN, | ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

The personal representative of Derek Boogaard's estate, who for ease of reference will be called "Boogaard" unless context requires otherwise, brought this suit in the Circuit Court of Cook County, Illinois, against the National Hockey League and its Board of Governors and Commissioner (collectively, "NHL"). Doc. 1-1. The complaint characterizes Boogaard's claims as arising under Illinois law. The NHL removed the case to this court under 28 U.S.C. § 1441, asserting that federal question jurisdiction lies under 28 U.S.C. § 1331 because Boogaard's purported state law claims are completely preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and thus in fact are federal claims.[*] Doc. 1.

---

[*] The NHL does not and likely could not argue that diversity jurisdiction lies under 28 U.S.C. § 1332. The personal representative of an estate is a citizen of the State of which the decedent was a citizen at the time of death. *See Hunter v. Amin*, 583 F.3d 486, 491-92 (7th Cir. 2009). Boogaard likely was a Minnesota citizen when he died. Doc. 1-1 at ¶ 42 (alleging that Boogaard's personal representative "was appointed by the State of Minnesota, Fourth Judicial Circuit Court"). The NHL "is an unincorporated association and, therefore, is a citizen of every state in which one of its members is a citizen." *Parker v. Centre Group L.P.*, 1995 WL 709724, at *1 (4th Cir. Dec. 4, 1995) (citable pursuant to 4th Cir. R. 32.1); *see* Doc. 1-1 at ¶ 37 (alleging that the NHL is "an unincorporated association of member teams"). One of the NHL's member

1

Boogaard has moved to remand the case to state court, arguing that his claims are not completely preempted by the LMRA and thus are true Illinois law claims. Doc. 23. Because at least some of Boogaard's claims are completely preempted, the motion is denied.

**Background**

The following facts, taken primarily from the complaint, are assumed true at this stage of the proceeding. From 2005 through 2011, Boogaard played in the NHL for the Minnesota Wild and the New York Rangers; his role was that of "an Enforcer/Fighter," meaning "a player that engages in fist-fights with players from the opposing team, on the ice, during a game." Doc. 1-1 at ¶ 2. The National Hockey League Players Association ("NHLPA") represents NHL players and negotiated the 2005 Collective Bargaining Agreement ("2005 CBA") with the NHL, which was in effect during Boogaard's entire career. *Id*. at ¶ 28; Doc. 1 at ¶ 3.

In his 277 regular season games, Boogaard scored three goals, participated in at least 66 fights, and sustained numerous painful physical injuries, for which NHL team physicians, dentists, trainers, and staff provided him "copious amounts of prescription pain medications, sleeping pills, and painkiller injections." Doc. 1-1 at ¶¶ 2-6, 16. Boogaard eventually became addicted to some of those drugs and was enrolled in the NHL's Substance Abuse and Behavioral Health ("SABH") Program. *Id*. at ¶¶ 1, 9-12. The terms of the SABH Program are set forth in a document that takes the form of an agreement signed by the NHL's commissioner and the NHLPA's executive director. Doc. 1-3. The agreement's first paragraph states that the SABH Program "is a comprehensive effort to address substance abuse among NHL players and their

---

teams, the Minnesota Wild, is located in Minnesota, Doc. 1-1 at ¶ 38, and thus likely is a Minnesota citizen, making the NHL a Minnesota citizen as well. With Minnesota citizens on both sides of the case, there is no diversity jurisdiction. *See MB Financial, N.A. v. Stevens*, 678 F.3d 497, 500 (7th Cir. 2012) ("A suit with citizens of Illinois on both sides cannot be removed under the diversity jurisdiction.").

families, to treat those with a substance abuse problem in a confidential, fair and effective way, and to deter such abuse in the future," and adds that the Program "has the full support of the League and the Players' Association and will be incorporated into the Collective Bargaining Agreement." *Id*. at 3. Through the SABH Program, Boogaard entered The Canyon, a rehabilitation facility, in September 2009 for in-patient treatment of his opioid and sleeping pill addiction. Doc. 1-1 at ¶ 13.

After his release from The Canyon, Boogaard signed with the New York Rangers and suffered a relapse. *Id*. at ¶¶ 15-19. In early April 2011, the SABH Program directed Boogaard to enter Authentic Rehabilitation Center ("ARC") in California for treatment of his opioid addiction. *Id*. at ¶ 20. Despite knowing that Boogaard was not complying with his treatment regimen, the NHL allowed Boogaard to be temporarily released from ARC without a chaperone on two occasions. *Id*. at ¶¶ 21-23. On the first night of his second release, Boogaard ingested a Percocet and was found dead the next day, on May 13, 2011. *Id*. at ¶¶ 24-25. The cause of death was determined to be an accidental drug overdose. *Id*. at ¶¶ 141-143.

After his death, Boogaard's parents and estate unsuccessfully sued the NHLPA in California for breach its duty of fair representation. *Boogaard v. Nat'l Hockey League Players Ass'n*, 2013 WL 1164301 (C.D. Cal. Mar. 20, 2013). Boogaard's personal representative then filed this suit against the NHL. Counts I and II of the complaint allege the NHL failed to prevent the over-prescription of addictive medications to Boogaard. Doc. 1-1 at ¶¶ 43-101. Counts III and IV allege that the NHL breached its voluntarily undertaken duty to curb and monitor Boogaard's drug addiction during the time he was enrolled in the SABH Program, including by failing to provide Boogaard with a chaperone for his second temporary release from ARC and by failing to warn him of the risks associated with leaving the facility. *Id*. at ¶¶ 102-200. Counts V

3

and VI allege the NHL was negligent in monitoring Boogaard for brain trauma during his career. *Id*. at ¶¶ 201-226. And Counts VII and VIII allege the NHL was negligent in permitting team doctors to inject Boogaard with Toradol, an intramuscular analgesic. *Id*. at ¶¶ 227-267.

**Discussion**

As noted above, the NHL premises federal subject matter jurisdiction on the ground that Boogaard's claims, which Boogaard characterizes as arising under Illinois law, are completely preempted by § 301 of the LMRA. The complete preemption doctrine "converts an ordinary state common-law complaint into one stating a federal claim." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1989). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law" for purposes of 28 U.S.C. §§ 1331 and 1441(a). *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013) (internal quotation marks omitted); *see also Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 707 F.3d 883, 894 (7th Cir. 2013).

Settled precedent holds that § 301 the LMRA completely preempts state law claims "founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394 (internal quotation marks omitted); *see also Nelson v. Stewart*, 422 F.3d 463, 467-69 (7th Cir. 2005); *In re Bentz Metal Products Co., Inc.*, 253 F.3d 283, 285-86 (7th Cir. 2001) (en banc). Complete preemption under § 301 "covers not only obvious disputes over labor contracts, but also any claim masquerading as a state-law claim that nevertheless is deemed 'really' to be a claim under a labor contract." *Crosby*, 725 F.3d at 797. "[T]o determine whether a purported state-law claim 'really' arises under Section 301, a federal court must look beyond the face of the

4

plaintiff's allegations and the labels used to describe her claims and … evaluate the *substance* of plaintiff's claims." *Id*. at 800 (internal quotation marks omitted). "[A] state-law claim is 'completely preempted' only when it is inextricably intertwined with consideration of the terms of the labor contract." *Ibid*. (internal quotation marks omitted).

The substance of Counts III and IV of the complaint, which allege that the NHL breached its voluntarily undertaken duty to properly care for and address Boogaard's drug addiction during his enrollment in the SABH Program, makes clear that those claims are completely preempted by § 301 of the LMRA. Counts III and IV allege, in relevant part, the following facts:

- Boogaard "was enrolled in the NHL's SABH Program." Doc. 1-1 at ¶ 103.

- The SABH Program "was granted exclusive, unsupervised control of player abuse issues by the NHL." *Id*. at ¶¶ 104-105.

- The SABH Program "is supposed to operate according to a defined regimen," under which players are initially placed in "Stage One" and then are demoted to "Stage Two," "Stage Three," and "Stage Four," with progressively more serious penalties at each stage, if they fail to comply with the Program's requirements. *Id*. at ¶ 111.

- On October 9, 2009, shortly before his release from The Canyon, the SABH Program instructed Boogaard as part of his "Aftercare Program" that "he was to refrain from all opioid and Ambien drug use" and warned that he could be permanently suspended from the NHL if he failed to comply, though Boogaard "would come to learn that this was an idle threat." *Id*. at ¶ 113.

- Despite the instructions imposed by his Aftercare Program, Boogaard received Ambien and other drugs from NHL team physicians, dentists, trainers, and staff. *Id*. at ¶ 120.

- Although from January 2011 through March 2011 Boogaard violated the Aftercare Program and his urine tested positive for prohibited substances on several occasions, Boogaard was not placed in Stage Two or Stage Three of the SABH Program's progressive disciplinary regimen. *Id*. at ¶¶ 121-127.

5

- After Boogaard was admitted to ARC in early April 2011, the NHL knew or should have known that he was not complying with his treatment regimen. *Id*. at ¶¶ 130-133.

- The SABH Program paid for Boogaard's first temporary release from ARC, but did not provide him with a chaperone, and during his release he purchased $4,000 of opioids on the street in New York. *Id*. at ¶¶ 134-136.

- Boogaard returned to ARC on May 4, 2011, and on May 12, 2011, Boogaard left on his second temporary release from the facility to attend his sister's graduation; the NHL did not provide Boogaard with a chaperone, did not provide him with an Aftercare Program or follow-up care instructions, and did not warn him of the risks of leaving the facility. *Id*. at ¶¶ 137-140.

- On May 12 and 13, 2011, Boogaard ingested Percocet and numerous Oxycondone pills, and he was found dead on May 13, 2011; the cause of death was determined to be an accidental drug overdose. *Id*. at ¶¶ 141-143.

With respect to Boogaard's claim that the foregoing acts and omissions breached the NHL's duties to him, Counts III and IV allege that when Boogaard "was admitted into the SABH Program in 2009, the NHL voluntarily undertook a duty to monitor, treat, and curb [his] drug addiction." *Id*. at ¶ 146. Those counts further allege that the NHL breached its duties by:

a. Failing to monitor and supervise its SABH Program;

b. Failing to place [Boogaard] in the SABH Program defined four stages of intervention;

c. Failing to intervene when necessary to treat [Boogaard] for substance abuse;

d. Failing to appropriately treat [Boogaard] for substance abuse;

e. Failing to ensure rapid, accurate diagnosis and intervention for [Boogaard's] relapse of prescription pain pill abuse;

f. Failing to adequately monitor [Boogaard] for prescription paid pill abuse following his discharge from "The Canyon" rehabilitation facility;

g. Failing to warn [Boogaard] of the increased risk of fatal overdose following his release from the ARC; and

6

    h. Failing to monitor [Boogaard] upon release from the ARC.

*Id*. at ¶ 147; *see also* Doc. 23 at 9 (in his motion for remand, Boogaard notes that his complaint "alleges [the NHL's] breaches based on the voluntary undertaking the NHL assumed and its SABH Program"); *id*. at 12 (arguing that "[t]he NHL failed to fulfill its self-imposed commitment to … prevent[] … addictions to controlled substances").

  By alleging that the NHL voluntarily undertook duties to Boogaard upon his enrollment in the SABH Program, and by further alleging that the NHL breached those voluntarily undertaken duties by failing to comply with the Program's requirements and by otherwise failing to properly treat Boogaard within the confines of the Program, Counts III and IV walk themselves into complete preemption. The voluntary undertaking theory of tort liability provides that "one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1153 (7th Cir. 2010) (quoting *Wakulich v. Mraz*, 785 N.E.2d 843, 854 (Ill. 2003)); *see also Homer v. Pabst Brewing Co.*, 806 F.2d 119, 121 n.2 (7th Cir. 1986) (same). "[A] voluntary undertaking is just that—voluntary—and as such, the scope of the duty that is assumed is limited to the extent of the undertaking." *LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003); *see also Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427, 1435 (7th Cir. 1989) (holding that "any duty [voluntarily] assumed [must] be limited strictly to the scope of the undertaking"). Where, as here, the extent of a defendant's voluntary undertaking is set forth in a collective bargaining agreement, the voluntary undertaking claim by necessity "is inextricably intertwined with consideration of the terms of the labor contract," *Crosby*, 725 F.3d at 800 (internal quotation marks omitted), and thus is completely preempted by § 301 of the LMRA. *See Banks v. Alexander*, 294 F. App'x 221, 224-25 (6th Cir. 2008) (holding that a claim against a union

7

official for failing to properly compensate the plaintiffs for making suggestions was completely preempted because the CBA is where the union official allegedly assumed the duty to provide such compensation and because determining whether the official breached that duty required interpreting the CBA); *England v. Thermo Prods., Inc.*, 956 F. Supp. 1446, 1455-56 (N.D. Ind. 1996) (holding that the employee's claim that the employer breached its voluntarily undertaken duty to disclose results of a chest x-ray was completely preempted because the CBA was alleged to have imposed the duty to take x-rays).

The point is illustrated, and the conclusion is compelled, by *International Brotherhood of Electrical Workers, AFL-CIO v. Hechler*, 481 U.S. 851 (1987). After being injured on the job, the plaintiff, Hechler, brought a tort suit against her union, alleging that by virtue of its collective bargaining agreement with her employer, the union had assumed the "duty of care to provide her with a safe workplace and to monitor her work assignments to ensure that they were commensurate with her skills and experience." *Id*. at 859; *see also id*. at 860. In determining whether Hechler's purported state law tort claim was completely preempted by § 301, and thus whether the suit had been properly removed to federal court, the Supreme Court noted that Hechler's "allegations of negligence assume significance if—and only if—the Union, in fact, had assumed the duty of care that the complaint alleges the Union breached." *Id*. at 861. The Court proceeded to explain:

> In order to determine the Union's tort liability, … a court would have to ascertain, first, whether the collective-bargaining agreement in fact placed an implied duty of care on the Union to ensure that Hechler was provided a safe workplace, and, second, the nature and scope of that duty, that is, whether, and to what extent, the Union's duty extended to the particular responsibilities alleged by respondent in her complaint. Thus, … it is clear that questions of contract interpretation … underlie any finding of tort liability.

*Id*. at 862 (internal quotation marks omitted) (third ellipses in original). The Court accordingly concluded that the tort claims were completely preempted: "The need for federal uniformity in

the interpretation of contract terms therefore mandates that … [Hechler] is precluded from evading the pre-emptive force of § 301 by casting her claim as a state-law tort action." *Ibid*.

The Seventh Circuit reached the same result in *Sluder v. United Mine Workers of America, International Union*, 892 F.2d 549 (7th Cir. 1989). As in *Hechler*, the plaintiff in *Sluder* was injured on the job and sued his union, alleging that the union breached its duty, which it had voluntarily undertaken in its collective bargaining agreement with Sluder's employer, to appropriately inspect the mine where Sluder worked. *Id*. at 551-52. In determining whether Sluder's purported state law tort claims were completely preempted by § 301, the Seventh Circuit noted that "before liability could be established, it would be necessary to establish that the union breached a specific duty it had assumed toward the employees," and that "[i]n order to define the scope of the duty assumed by the union, it would be necessary to establish the precise responsibility assumed by the union." *Id*. at 554. The Seventh Circuit proceeded to observe that "it would not be possible to define, with the precision demanded by Illinois [voluntary undertaking] law, the scope of the union's duty without reference to the collective bargaining agreement that governs the relationship between the company and the union." *Ibid*. That inquiry into the scope of the union's duty, the Seventh Circuit found, would not be mechanical or factual; instead, "the question of duty in this case is one of law and is open to varying interpretations under the collective bargaining agreement." *Id*. at 554-55. The Seventh Circuit concluded that because Sluder's purported state law tort claims "can be resolved only by defining the precise nature of the duty assumed by [the union], and that duty can be defined only by reference to the collective bargaining agreement," the claims were completely preempted. *Id*. at 555-56.

*Hechler* and *Sluder* govern this case. The nature and scope of the NHL's voluntarily assumed duties to Boogaard—for example, whether the NHL was obligated to provide Boogaard with a chaperone or to otherwise monitor him during his temporary releases from ARC, whether the NHL was obligated to closely monitor Boogaard for compliance with his SABH regime and to strictly enforce the Stage Two and Three progressive disciplinary regimen, and whether the NHL was obligated to warn Boogaard of the increased risk of fatal overdose following his release from ARC—are governed by the SABH Program agreement. Delineating the scope of the NHL's voluntarily assumed duties would not be a mechanical exercise, as the agreement does not explicitly answer the question whether the NHL had voluntarily undertaken the duties that are alleged by Boogaard to have been breached. *See In re Bentz*, 253 F.3d at 285 ("the overriding principle is that for preemption to apply, *interpretation* of the CBA and not simply a reference to it is required"); *cf. Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 39-40 (2d Cir. 1997) (rejecting complete preemption where the court would have to consult the CBA only to ascertain the plaintiff's rate of pay). It necessarily follows that resolution of Boogaard's SABH-related claims in Counts III and IV are "substantially dependent on analysis of a collective-bargaining agreement," *Caterpillar*, 482 U.S. at 394 (internal quotation marks omitted), and thus are completely preempted by § 301. *See Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1182 (11th Cir. 2010) (holding that players' claims against the NFL regarding league-approved financial advisors were completely preempted because "any duty the NFL owed Plaintiffs [required the court] to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship"); *Williams v. Nat'l Football League*, 582 F.3d 863, 881 (8th Cir. 2009) (holding completely preempted a common law duty to warn claim because it required "examining the parties' legal relationship

10

and expectations as established by the CBA"); *Duerson v. Nat'l Football League*, 2012 WL 1658353, at *4 (N.D. Ill. May 11, 2012) (holding that complete preemption applied where resolving the plaintiff's claims required examining whether the decedent's "concussive brain trauma was 'significantly aggravated[]' within the meaning of the CBA"); *Stringer v. Nat'l Football League*, 474 F. Supp. 2d 894, 909-11 (S.D. Ohio 2007) (finding complete preemption because the wrongful death claim "must be considered in light of pre-existing contractual duties imposed by the CBA").

A central premise of the foregoing analysis is that the SABH Program is part of the 2005 CBA. Boogaard strenuously objects to that premise, arguing that the SABH Program is not part of the 2005 CBA. Doc. 1-1 at ¶ 104; Doc. 23 at 9-10; Doc. 31 at 8-9. Boogaard is wrong.

As noted above, the terms of the SABH Program are set forth in an agreement whose first paragraph states that the Program "has the full support of the League and the Players' Association and will be incorporated into the Collective Bargaining Agreement." Doc. 1-3 at 3. The agreement in fact is an agreement, as evidenced by its signature page, where the NHL's commissioner and the NHLPA's executive director affix their signatures on behalf of their respective organizations and under the words "AGREED TO AND ACCEPTED." *Id*. at 9. The SABH Program agreement is dated September 1996. *Id*. at 2. The 2005 CBA's preamble states: "This Collective Bargaining Agreement, together with all Exhibits hereto[,] … supersedes and replaces all prior collective bargaining agreements between the parties." Doc. 1-2 at 20.

Boogaard argues that because the SABH Program agreement predates the 2005 CBA by nine years, and because it is not attached as an exhibit to the 2005 CBA, the agreement is not part of the 2005 CBA. Boogaard's argument cannot be reconciled with the 2005 CBA's plain terms. Article 33 of the 2005 CBA states:

11

> This Agreement, together with the exhibits and side letters hereto, if any, *and any existing letter agreements between the parties that are not inconsistent with this Agreement*, constitutes the entire understanding between the parties, and all written communications, proposals and counterproposals (including any drafts of this Agreement) between the NHL and the NHLPA, or on behalf of them, are merged into and superseded by this Agreement and shall be of no force or effect.

*Id.* at 151 (emphasis added). So, while it is true that the SABH Program agreement is not an "exhibit" or "side letter[]" to the 2005 CBA, *see id.* at 263-473, the agreement is among the "existing letter agreements between the parties that are not inconsistent with" the CBA. The SABH Program agreement certainly is an agreement, and it is not inconsistent with any other provision of the 2005 CBA. To the contrary, the 2005 CBA expressly acknowledges the continuing existence and validity of the SABH Program. Specifically, Article 47 addresses performance enhancing substances and creates a Performance Enhancing Substance Program. Article 47.3 states that the Performance Enhancing Substance Program "shall be limited to addressing the testing for and use of prohibited performance enhancing substances," and clarifies that "[a]ll other forms of 'substance abuse' and behavioral and domestic issues requiring employee assistance will continue to be handled through the NHL/NHLPA Program for Substance Abuse and Behavioral Health (the 'SABH Program')." *Id*. at 152. Article 47.3's explicit reference to the SABH Program demonstrates that the 2005 CBA contemplated that the Program was consistent with the CBA, and thus among the existing agreements incorporated by Article 33. To the extent any doubt remains, the SABH Program agreement itself states that it "*will be* [future tense] incorporated into the Collective Bargaining Agreement." Doc. 1-3 at 3.

Because Counts III and IV are completely preempted, those claims are federal claims under 28 U.S.C. § 1331 and thus were properly removed under 28 U.S.C. § 1441(a). Given this conclusion, there is no need to determine whether the complaint's other claims are completely preempted. Even if the complaint's other claims are not completely preempted—that is, even if

12

they truly are state law claims—the court has supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367(a). *See Cavallaro v. UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 5 (1st Cir. 2012) ("Thus, on a minimum reading of the complete preemption cases, one or more of plaintiffs' claims are removable; any such claim makes the *case* removable, 28 U.S.C. § 1441(c); and even the claims not independently removable come within the supplemental jurisdiction of the district court, 28 U.S.C. § 1367(a).") (citation omitted); *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332-33 (2d Cir. 2011) (same); *Duerson*, 2012 WL 1658353, at *2 (same).

## Conclusion

For the foregoing reasons, Boogaard's motion to remand is denied.

February 20, 2014

_____
United States District Judge