UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEN BOOGAARD and JOANNE BOOGAARD, | ) | |
| Personal Representatives of the Estate of DEREK | ) | |
| BOOGAARD, Deceased, | ) | 13 C 4846 |
| | ) | |
| Plaintiff, | ) | Judge Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| NATIONAL HOCKEY LEAGUE, NATIONAL | ) | |
| HOCKEY LEAGUE BOARD OF GOVERNORS, and | ) | |
| GARY B. BETTMAN, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

The personal representative of the estate of Derek Boogaard (for ease of exposition, the court will pretend that Boogaard himself is the plaintiff) brought this suit in the Circuit Court of Cook County, Illinois, against the National Hockey League, its Board of Governors, and Commissioner Gary Bettman (collectively, "NHL"), alleging what the complaint took pains to characterize as Illinois tort law claims. Doc. 1-1. The NHL removed the suit to this court on the ground that the claims were completely preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and thus in fact arose under federal law. Doc. 1. The court denied Boogaard's motion to remand, holding that two of the complaint's eight counts were completely preempted and thus federal; there was no need to address the other six counts because removal is proper even if only one claim is federal. Docs. 37-38 (reported as *Nelson v. Nat'l Hockey League*, 20 F. Supp. 3d 650 (N.D. Ill. 2014)).

An amended complaint named new personal representatives and added references to Minnesota law. Doc. 62. The NHL moved to dismiss under Federal Rule of Civil Procedure

12(b)(6), Docs. 43, 86, and the court invoked Rule 12(d) to convert the motion into a Rule 56 motion for summary judgment, Doc. 58. Over a year of discovery (including extensive motion practice) ensued, after which the summary judgment motion became fully briefed. Because all of Boogaard's claims are completely preempted by § 301 of the LMRA, and because the claims are not viable under the LMRA, the NHL is entitled to summary judgment.

## Background

The following facts are stated as favorably to Boogaard, the non-movant, as the record permits. *See Woods v. City of Berwin*, 803 F.3d 865, 867 (7th Cir. 2015). Both sides largely rely on the same factual predicates. The court therefore will draw background facts from the amended complaint, except for when the parties disagree over a particular material fact.

The NHL is a professional ice hockey league. Doc. 62 at ¶ 36. The National Hockey League Players' Association ("NHLPA") represented the NHL's players in negotiating the 2005 Collective Bargaining Agreement ("2005 CBA"), which governed relations between the players, the NHL, and its thirty teams at all relevant times. *Id*. at ¶¶ 28, 36. The NHLPA and the NHL also negotiated a 1996 agreement establishing the Substance Abuse and Behavioral Health Program ("SABH Program"),[*] which was created "to address substance abuse among NHL

_____

[*] Boogaard's brief asserts that it is "unclear" whether the SABH Program resulted from an agreement between the NHL and the NHLPA, Doc. 101 at 7, 11, but there is no genuine dispute over the question. The document establishing the SABH Program ends with a field captioned, "Agreed to and Accepted," followed by Bettman's signature under "National Hockey League," and the signature of Robert W. Goodenow—the NHLPA's Executive Director and General Counsel—under "National Hockey League Players' Association." Doc. 10-3 at 9. The NHL also submitted an unrebutted declaration by Jessica Berman, Senior Counsel in the NHL's Legal Department, averring that the SABH Program Agreement was "negotiated between the NHL and the NHLPA." Doc. 10 at ¶¶ 1, 4. That is exceptionally strong evidence that the SABH Program was created by an agreement between the NHL and the NHLPA, and Boogaard has adduced no evidence to the contrary. *See Carroll v. Lynch*, 698 F.3d 561, 566 (7th Cir. 2012) (holding, where the defendants had offered evidence of a fact and the plaintiff offered no evidence "contradicting or undermining" the fact, that "no genuine dispute of material fact exist[ed]").

players and their families, to treat those with a substance abuse problem in a confidential, fair and effective way, and to deter such abuse in the future." Doc. 10 at ¶ 4; Doc. 10-3 at 3, 9.

Boogaard played in the NHL from 2005 to 2011, first for the Minnesota Wild and then for the New York Rangers. Doc. 62 at ¶¶ 1-2, 15. He was an "Enforcer/Fighter," which meant that his principal job was to get into fistfights with opposing players during games—a task he performed at least 66 times over his career. *Id.* at ¶¶ 2-3. The fights often left Boogaard with painful injuries, which team physicians, dentists, trainers, and staff treated using "copious amounts of prescription pain medications, sleeping pills, and painkiller injections." *Id.* at ¶¶ 4-6.

Boogaard became addicted to opioids, a class of painkillers. *Id.* at ¶ 10. In 2009, the NHL placed him in the SABH Program, whose administrators checked him into an inpatient rehabilitation facility in California called "the Canyon." *Id.* at ¶ 13. Boogaard was discharged from the Canyon and signed with the New York Rangers, but he suffered a relapse. *Id.* at ¶¶ 15-19. The SABH Program's administrators then sent him to a different rehab facility, called Authentic Rehabilitation Center ("ARC"). *Id.* at ¶ 20.

The therapists at ARC reported that Boogaard would not comply with his treatment regimen and that he thought of rehab as a hurdle to clear before he could return to the ice rather than as a necessary medical intervention. *Id.* at ¶ 21. The NHL knew or had reason to know that Boogaard was not complying with his treatment, but it twice allowed ARC to temporarily release him without a chaperone. *Id.* at ¶¶ 22-23. On the first night of his second release, Boogaard took Percocet; the next morning, on May 13, 2011, he was found dead of an accidental drug overdose. *Id.* at ¶¶ 25, 141-43.

Posthumous tests revealed that Boogaard suffered from a progressive neurodegenerative illness known as Chronic Traumatic Encephalopathy, or "CTE." *Id.* at ¶ 26-27. Boogaard's

CTE likely resulted from the dozens of brain injuries that he sustained during his hockey career. *Ibid*. Boogaard's brain had deteriorated particularly in the areas that controlled judgment, inhibition, mood, behavior, and impulse control. *Id*. at ¶ 27.

Boogaard's parents and estate sued the NHLPA in California for breaching its duty of fair representation under federal labor law by failing to file a grievance with the NHL, and the district court dismissed the suit because it was filed after the six-month statute of limitations for such claims had run. *See Boogard v. Nat'l Hockey League Players Ass'n*, 2013 WL 1164301 (C.D. Cal. Mar. 20, 2013) (noting, *id*. at 1 n.1, that the case caption misspelled Boogaard's name). Less than two months after the dismissal, Boogaard filed this suit against the NHL. Doc. 1-1. Counts I and II of the amended complaint allege that the NHL negligently failed to prevent Boogaard from becoming addicted to opioids and sleeping pills. Doc. 62 at ¶¶ 43-101. Counts III and IV allege that the NHL breached its voluntarily undertaken duty to curb and monitor Boogaard's drug addiction while he was enrolled in the SABH Program, including by failing to provide him with a chaperone for his second temporary release from ARC and by failing to warn him of the risks associated with leaving the facility. *Id*. at ¶¶ 102-200. (Those are the counts that the court previously held were completely preempted by the LMRA. 20 F. Supp. 3d at 654-58.) Counts V and VI allege that the NHL was negligent in failing to protect Boogaard from brain trauma during his career, violating its voluntarily undertaken duty to protect his health. *Id*. at ¶¶ 201-26. And Counts VII and VIII allege that the NHL breached its voluntarily undertaken duty to protect Boogaard's health by failing to prevent team doctors from injecting him with Toradol, an intramuscular analgesic that, according to Boogaard, makes concussions more likely and more dangerous. *Id*. at ¶¶ 227-67.

**Discussion**

The NHL seeks summary judgment on the ground that all of Boogaard's claims are completely preempted by § 301(a) of the LMRA. Doc. 44 at 13-40. The complete preemption doctrine "converts an ordinary state common-law complaint into one stating a federal claim." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (internal quotation marks omitted). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim." *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013) (internal quotation marks omitted); *see also Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 707 F.3d 883, 894 (7th Cir. 2013).

Section 301(a) of the LMRA states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). As interpreted by the Supreme Court, the provision does more than authorize federal courts to hear labor disputes; it also completely preempts state law claims "founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394 (internal quotation marks omitted); *see also Nelson v. Stewart*, 422 F.3d 463, 467-69 (7th Cir. 2005); *In re Bentz Metal Prods. Co.*, 253 F.3d 283, 285-86 (7th Cir. 2001) (en banc). Preemption under § 301 "covers not only obvious disputes over labor contracts, but also any claim masquerading as a state-law claim that nevertheless is deemed 'really' to be a claim under a labor contract." *Crosby*, 725 F.3d at 797.

"[T]o determine whether a purported state-law claim 'really' arises under Section 301, a federal court must look beyond the face of plaintiff's allegations and the labels used to describe her claims and … evaluate the *substance* of plaintiff's claims." *Id*. at 800 (internal quotation marks omitted). "[A] state-law claim is 'completely preempted' only when it is 'inextricably intertwined with consideration of the terms of [a] labor contract.'" *Ibid*. (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985)). Put another way, § 301 preempts any state law claim whose resolution "requires the interpretation of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988); *see also Crosby*, 725 F.3d at 800 ("[O]nly those state-law claims that require 'interpretation' of a CBA are inevitably federal."); *Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 727 (7th Cir. 2000) (holding that § 301 preempted a tortious interference claim because the claim required the plaintiff to prove that his employer breached a collective bargaining agreement).

Section 301 preemption is not boundless. A state law claim is not preempted simply because it "require[s] reference to" a collective bargaining agreement. *In re Bentz Metal Prods.*, 253 F.3d at 285. Thus, "the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301." *Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994). Moreover, even a state law claim that turns on the meaning of a collective bargaining agreement will escape preemption "when the particular contractual provision is so clear as to preclude all possible dispute over its meaning … [or] if the parties do not dispute the interpretation of the relevant … provisions." *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 758 (7th Cir. 2008) (internal quotation marks, brackets, and citations omitted) (discussing the Railway Labor Act, 45 U.S.C. § 151 *et seq*.); *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994) (describing the RLA preemption standard as "virtually

identical to the pre-emption standard the Court employs in cases involving § 301 of the LMRA"). Thus, a state law claim is not completely preempted under circumstances where a defendant contending that a state law claim requires interpretation of a collective bargaining agreement advances a frivolous or insubstantial reading of the agreement; preemption applies only where the parties' respective interpretations of the agreement are arguable or plausible. *See Baker v. Kingsley*, 387 F.3d 649, 659 (7th Cir. 2004) ("Because defendants' interpretation is plausible, and demonstrates a genuine dispute between the parties that can affect liability, it is a sufficient basis for preemption.").

As noted, the court has already held that Counts III and IV are completely preempted. After the NHL removed this case to federal court, Boogaard moved to remand the case to state court, arguing that this court lacked jurisdiction because his claims were true state law claims and thus not preempted by § 301. Doc. 23. The court denied remand on the ground that Counts III and IV, which allege that the NHL voluntarily assumed a duty to monitor and cure Boogaard's addiction according to the terms of the agreement creating the SABH Program, were completely preempted and thus arose under federal law; the court reasoned that the agreement creating the program was collectively bargained and that resolving Counts III and IV would require the court to interpret it. 20 F. Supp. 3d at 656.

Boogaard does not urge a change of tack on Counts III and IV, and the court stands by its analysis. But Boogaard does argue that his other claims are not completely preempted. Doc. 101 at 32 ("As illustrated above, Counts I, II, V, VI, VII, and VIII of the Complaint unequivocally state tort causes of action, without any need for consulting the CBA."). The court now turns to those claims.

Counts V through VIII—which allege that the NHL was negligent in failing to protect Boogaard from brain trauma during his career, violating its voluntarily undertaken duty to protect his health (Counts V-VI), and that the NHL breached its voluntarily undertaken duty to protect Boogaard's health by failing to prevent team doctors from injecting him with Toradol (Counts VII-VIII)—are preempted because they would require the court to interpret the 2005 CBA to determine the scope of any duty that the NHL had actually assumed. State tort law generally does not impose any duty to act to protect others from harm. *See Restatement (Second) of Torts* § 314 (1965) ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). Illinois and Minnesota law recognize an exception to the general rule, called the voluntary undertaking doctrine, which provides that "liability can arise from the negligent performance of a voluntary undertaking." *Pippin v. Chi. Housing Auth.*, 399 N.E.2d 596, 599 (Ill. 1979); *accord Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 570 (Minn. 1979) (holding that the defendant owed the plaintiff a duty to "exercise reasonable care" in providing fire protection services at an airport because the defendant "voluntarily undertook to render fire protection services to airport users"). Simply stated, the doctrine provides that if a person sets out to help someone, she assumes a duty to do so reasonably. (The amended complaint cites both Minnesota and Illinois law, Doc. 62 at ¶¶ 71, 101, 150, 200, 212, 226, 245, 267, but neither side addresses which State's substantive law is pertinent, and the court's analysis does not depend on the answer.)

The voluntary undertaking doctrine is narrow. As the Supreme Court of Illinois explained, courts would risk deterring good deeds if they construed assumed duties too broadly; if people had to help a lot whenever they helped a little, they might hesitate to help at all. *See*

8

*Frye v. Medicare-Glaser Corp.*, 605 N.E.2d 557, 560 (Ill. 1992) ("[I]f we were to hold that by choosing to place the 'drowsy eye' label on Frye's prescription container defendants were assuming the duty to warn Frye of all of Fiorinal's side effects, we believe that pharmacists would refrain from placing any warning labels on containers. Thus, consumers would be deprived of any warnings which might be beneficial."). Accordingly, "the scope of the duty that is assumed is limited to the extent of the undertaking." *LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003) (Illinois law); *accord Figueroa v. Evangelical Covenant Church,* 879 F.2d 1427, 1435 (7th Cir. 1989) (holding under Illinois law that "any duty [voluntarily] assumed [must] be limited strictly to the scope of the undertaking"); *Vesey v. Chi. Housing Auth.*, 583 N.E.2d 538, 544 (Ill. 1991); *Bjerke v. Johnson*, 727 N.W.2d 183, 190 (Minn. App. 2007) ("The extent of the duty [voluntarily assumed] is defined by the extent of the undertaking."); *Castro v. Brown's Chicken and Pasta, Inc.*, 732 N.E.2d 37, 42 (Ill. App. 2000). In *Frye*, for instance, the Supreme Court of Illinois held that a pharmacist was not liable for failing to warn a customer that a certain medication was dangerous in combination with alcohol, even though she voluntarily warned him that the medication caused drowsiness. 605 N.E.2d at 560. By warning about drowsiness, the court held, the pharmacist undertook only to warn about drowsiness; she did not undertake to warn about other side effects, too. *Ibid.*

Counts V through VIII allege that the NHL voluntarily assumed a duty to "keep [players] reasonably safe," especially from brain trauma, by taking steps throughout its history to make hockey a safer sport—"penalizing high-sticking in 1929, penalizing kicking in 1932, penalizing tripping in 1934, prohibiting metal 'armor' in 1937, flooding the ice surface between periods in 1941, prohibiting bench players from joining a brawl in 1959, prohibiting bodily contact during face-offs in 1964, instituting the helmet requirement in 1979, etc." Doc. 62 at ¶¶ 208, 220, 242,

261; Doc. 101 at 13 n.3.  As noted, Counts V through VIII claim that the NHL breached that voluntarily assumed duty by failing to protect Boogaard from concussions and CTE (Counts V and VI) and by failing to prevent team doctors from injecting him with Toradol (Counts VII and VIII).  Doc. 62 at ¶¶ 208-10, 220-22, 242-44, 261-63.

Resolving those claims would require the court to interpret the 2005 CBA in order to determine the true scope of the NHL's voluntarily assumed duties.  "[W]hether a voluntary undertaking has been assumed is necessarily a fact-specific inquiry."  *LM*, 344 F.3d at 700; *accord Bourgonje v. Machev*, 841 N.E.2d 96, 114 (Ill. App. 2005) ("[T]he existence and extent of voluntary undertakings are to be analyzed on a case-by-case basis.").  Such an inquiry would entail considering all of the NHL's relevant acts to determine whether it undertook to "keep [players] reasonably safe during their NHL careers," as Boogaard contends, or whether it undertook only to protect players from more specific harms, such as high sticking, kicking, and tripping.  Doc. 62 at ¶¶ 208, 220, 242, 261; Doc. 101 at 13 n.3.  In so doing, the court would have to closely consider the 2005 CBA, the negotiation of which was perhaps the act most relevant to the scope of the NHL's undertaking.  The NHL spent years bargaining with the NHLPA, and the process produced a document exhaustively detailing each party's specific obligations to the others.  *E.g.*, Doc. 10-2 at 97 ("The Club acquiring a Player through a Trade shall provide the Player a single room hotel accommodation at the Club's expense for a period of up to twenty-one days (21) in the city to which he has been Traded."); *id.* at 114 ("Maximum fining authority for a Player is $2,500.00."); *id.* at 119 ("Each Club shall make available for purchase two (2) tickets per Player of each visiting team, provided, however, that the maximum number of tickets to be made available for any game shall be fifty (50).").  Thus, the specific acts by the NHL that Boogaard insists represent a broader and more generalized commitment to

10

protect players from harm must be interpreted in context with the hyper-specific commitments that the NHL made in the CBA itself.

Counts V and VI allege that the NHL was negligent for failing to impose a "bench concussion assessment protocol" and for allowing players to return after a concussion without first being cleared by an independent doctor as well as a team doctor. Doc. 62 at ¶¶ 209(f)-(i), 221(f)-(i). The NHL argues that the CBA gave it no control over the procedures that team doctors used to diagnose and manage concussions. Doc. 44 at 28-29. Article 16.11 governed the procedures for Injured Reserve, a status that allowed players to recuperate from injury without counting against the limit on the number of active players a team could deploy at one time. Doc. 10-2 at 104-05. Article 16.11(e) required the team doctor, applying "the Club's medical standards," to certify that a player was eligible for Injured Reserve. *Id*. at 105. That could plausibly be taken to provide that teams were free to develop their own "medical standards" for diagnosing injuries, including concussions, without the NHL's interference. Article 16.11(g) provided that a player on Injured Reserve was eligible to return to play "beginning on the 8th day following the date of injury … or any day thereafter that the Player is medically cleared to play by the Club physician"—which could plausibly be taken to provide that the NHL could not have additionally required an independent physician's consent before a concussed player was allowed to return. *Ibid*.

If the NHL has read Article 16 correctly, and the CBA prevented it from imposing "bench assessment protocols" and from requiring "neuro-physical exams by an independent physician" before concussed players could return to the ice, then the NHL likely could not be found to have voluntarily assumed a duty to take those steps. Indeed, such a reading of Article 16 would counsel against any interpretation of the NHL's assumed duty at a level of generality

higher than "to protect players from high-sticking"; it is unlikely that the NHL would have assumed responsibility for "keeping players reasonably safe" and "preventing brain trauma" while simultaneously adopting a collective bargaining agreement that prohibited them from taking steps necessary to meet those responsibilities. *See Sluder v. United Mine Workers of Am., Int'l Union*, 892 F.2d 549, 554 (7th Cir. 1989) (holding completely preempted a state law claim against a union for breaching an assumed duty to protect workers from a mining accident on the ground that the court would have to interpret a collective bargaining agreement to determine whether the union had the authority to close the mine).

Similarly, while Counts V and VII allege that the NHL should have changed the rules of play to discourage fighting, Doc. 62 at ¶¶ 201, 209(a), 209(c), 213, 221(a), 221(c), the NHL contends that Article 30.3 of the 2005 CBA prevented it from changing the rules of play unilaterally, Doc. 44 at 36. Article 30.3 reads:

> The NHL and its Clubs shall not … amend or modify the provisions (or portions thereof) of the League Rules or any of the League's Playing Rules in existence on the date of this Agreement which affect terms or conditions of employment of any Player, without the prior written consent of the NHLPA which shall not be unreasonably withheld.

Doc. 10-2 at 146. Rules about fighting could reasonably be viewed as "Playing Rules … which affect terms or conditions of employment of any Player"; after all, stricter treatment of fighting, such as mandating ejections or lengthy suspensions, could have dramatically affected the terms and conditions under which Enforcers like Boogaard played, if not put them out of work altogether. And if Article 30.3 meant that the NHL could not have more severely punished fighting without first haggling with the NHLPA, then it is unlikely that the NHL's voluntarily assumed duties included an obligation to change the rules of play to make the game safer by not changing the rules of play to further discourage fighting.

The point here is not to run to ground the question whether the NHL has in fact correctly read Articles 16 and 30 of the 2005 CBA. Rather, the point is that the NHL's reading is, at a minimum, plausible and arguable, which means that ascertaining the scope of the NHL's voluntarily assumed duties would require interpreting the CBA, which in turn means under settled law that Counts V and VI are completely preempted. *See Baker*, 387 F.3d at 659.

Counts VII and VIII, which allege that the NHL breached its voluntarily undertaken duty to protect Boogaard's health by failing to prevent team doctors from injecting him with Toradol, fare no better. The NHL contends that the 2005 CBA prohibited it from interfering with medical decisions regarding players. Doc. 44 at 23-24 & n.10, 37-39. The CBA incorporated the Prescription Medication Program, a set of rules extensively regulating when and how team doctors and trainers could administer prescription medications. Doc. 10-2 at 24, 146; Doc. 101-1 at 13-28. For instance, it required a team's trainers to report the team's inventory of prescription drugs at the beginning of each season (Doc. 101-1 at 15); required teams to maintain four copies of an "Agent of Record Statement" authorizing the trainers to act as the team doctors' agents (*id.* at 16); required teams to adopt written guidelines for complying with the Prescription Medication Program (*id.* at 17); and required teams to store prescription medications separately from other products (*id.* at 18). The Prescription Medication Program also explicitly prohibited team doctors from prescribing or otherwise dispensing drugs "merely to enhance [an employee's] performance or to reduce fatigue," and it barred athletic trainers from "giv[ing] an injection of any kind to any person." *Ibid*. The Prescription Medication Program, together with Article 30.3's prohibition on unilateral amendments to important league rules, arguably implies that the NHL otherwise lacked the authority to direct how teams administered and tracked medications. That in turn arguably suggests that the NHL's voluntarily assumed duties did not

13

include prohibiting team doctors from administering Toradol. It follows, for the reasons given above as to Counts V and VI, that Counts VII and VIII are completely preempted.

Boogaard argues that the NHL has not identified any concrete interpretive disputes, and therefore that the question of preemption under § 301 is premature. Doc. 101 at 27; *see Wis. Cent.*, 539 F.3d at 758 (holding that the preemption issue was premature because "the parties ha[d] not yet staked out a position for the record as to what [the relevant] CBA provisions mean[t]"). It is true that the NHL's briefs sometimes muddy up its gloss on the CBA. *E.g.*, Doc. 44 at 17-18 n.7 ("To the extent Plaintiff disputes whether the SABH applies to the addiction at issue, this Court will be required to interpret the meaning of Article 47.3 and the SABH, in which case Plaintiff's addiction-related claims are preempted. If, on the other hand, Plaintiff concedes that his addiction-related claims are governed by the SABH, then Counts I and II plainly arise under a collective bargaining agreement and are preempted ...."; the brief never asserts whether the addiction claims actually are governed by the agreement creating the SABH Program). But *Wisconsin Central* and like precedents demand only disagreement, not pristine briefing. A reasonably attentive reader can glean the NHL's positions clearly enough—it believes that it has no authority to impose concussion assessment protocols on teams and team doctors, that it cannot prohibit team doctors from administering Toradol, and that it cannot change the rules to further discourage fighting without the NHLPA's consent. Doc. 44 at 28-29, 37-39. And Boogaard takes the opposite positions—he asserts that the NHL overstates the difficulty of changing the rules of play and that it can control the conduct of team doctors. Doc. 101 at 23-25. The court would have to resolve those reasonably debatable issues before adjudicating Boogaard's claims, and would have to interpret the CBA when doing so, which triggers complete preemption.

14

Citing *Lingle v. Norge Division of Magic Chef, Inc.*, *supra*, Boogaard submits that "[m]ere topical similarity between a claim and a CBA does not justify a finding of preemption." Doc. 101 at 26. In *Lingle*, a unionized employee sued her employer, alleging that it fired her in retaliation for claiming workers' compensation, in violation of an Illinois statute. The employer argued that § 301 preempted the claim because the collective bargaining agreement prohibited the employer from firing employees without just cause. The Supreme Court held that the claim was not preempted, even though "the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether [the employee] was fired for just cause." *Lingle*, 486 U.S. at 408. As the Court explained, because no element of the claim "require[d] a court to interpret any term of a collective-bargaining agreement," the claim could go forward. *Id.* at 407; *see also Crosby*, 725 F.3d at 800 ("Factual overlap between a state-law claim and a claim one could assert under a CBA is not necessarily sufficient[ for preemption].").

But an element of the claims in Counts V through VIII *would* require the court to interpret terms of the 2005 CBA. In both Illinois and Minnesota, the "essential elements of the ordinary negligence action" are "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury." *Gradjelick v. Hance*, 646 N.W.2d 225, 230-31 (Minn. 2002); *accord Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 973 N.E.2d 880, 887 (Ill. 2012). Whether the NHL owed Boogaard a duty to take the steps that Counts V through VIII fault it for failing to take depends largely on genuinely contested interpretations of the CBA. Those claims therefore are completely preempted.

Counts I and II differ from Counts III through VIII in that they do not allege that the NHL violated a voluntarily assumed duty; rather, they allege that the NHL "owed a duty to [Boogaard] to keep him reasonably safe during his NHL career and to refrain from causing an

addiction to controlled substances." Doc. 62 at ¶¶ 68, 97. That wrinkle does not allow Counts I and II to escape preemption because to adjudicate those claims, the court would have to interpret the 2005 CBA to determine whether the NHL actually had a duty to protect Boogaard from addiction.

In alleging that the NHL should have done more to avert Boogaard's addiction, Counts I and II at times insinuate that the NHL actively caused his addiction; for instance, they describe the NHL's duty as one "to refrain from causing an addiction to controlled substances." In substance, however, Counts I and II allege sins of omission. They do not contend that the NHL gave Boogaard the addictive painkillers. They instead fault the NHL for failing to take specific, active measures to ward off Boogaard's addiction: tracking his prescriptions and sharing the information with team doctors, Doc. 62 at ¶¶ 69(b), 69(d)-(f), 69(h), 98(b), 98(d)-(f), 98(h); cutting him off from opioids before his intake put him at serious risk of addiction, *id*. at ¶¶ 69(c), 69(g), 98(c), 98(g); and warning him of the "increased risk of substance abuse due to his role as Enforcer/Fighter," *id*. at ¶¶ 69(a), 98(a).

As noted, the voluntary undertaking doctrine is one exception to the general rule that there is no duty to act to protect others from harm. Another exception holds that the defendant has a duty to protect the plaintiff "when the parties are in a special relationship and the harm to the plaintiff is foreseeable." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011); *accord Iseberg v. Gross*, 879 N.E.2d 278, 284 (Ill. 2007) ("Under common law, the universally accepted rule, articulated in section 314 of the Restatement (Second) of Torts, and long adhered to by this court, is that a private person has no duty to act affirmatively to protect another from criminal attack by a third person absent a 'special relationship' between the parties."). "Historically, there have been four 'special relationships' which [the courts] have recognized, namely, common

16

carrier-passenger, innkeeper-guest, business invitor-invitee, and voluntary custodian-protectee."
*Iseberg*, 879 N.E.2d at 284; *accord H.B. by and through Clark v. Whittemore*, 552 N.W.2d 705,
708 (Minn. 1996). Boogaard does not allege that the NHL is a common carrier or an innkeeper,
or that it owned or operated any of the buildings in which he suffered injuries. Doc. 62. That
leaves "custodian-protectee" as the only category into which the NHL and Boogaard might fit.

Minnesota and Illinois apply similar standards to determine whether one party is
another's "custodian." In a typical custodial relationship, "the plaintiff is in some respect
particularly vulnerable and dependent on the defendant, who in turn holds considerable power
over the plaintiff's welfare." *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539
N.W.2d 789, 792 (Minn. 1995); *accord Harper v. Herman*, 499 N.W.2d 472, 474 n.2 (Minn.
1993); *Doe v. Big Brothers Big Sisters of Am.*, 834 N.E.2d 913, 926 (Ill. App. 2005); *Platson v.
NSM, Am., Inc.*, 748 N.E.2d 1278, 1287 (Ill. App. 2001) (quoting *Donaldson*, 539 N.W.2d at
792). The defendant's ability to control the plaintiff's behavior and circumstances strongly bears
on the question whether a custodial relationship exists. *See Big Brothers Big Sisters*, 834 N.E.2d
at 927 (holding that a national mentoring organization did not have custody over a child mentee,
in part because "it had no ability to guard or protect [him]; it had no authority over him; and it
had no manner in which to dictate any of his activities, how he was cared for, *etc.*"); *H.B.*, 552
N.W.2d at 709 (holding that the resident manager of a trailer park lacked custody over children
living in the park, in part because "she exercised no control over their daily welfare").

The parties dispute the amount of control that the NHL had over Boogaard's welfare, and
the focus of their dispute is on the terms of the 2005 CBA, Doc. 44 at 18, 28-29, 36-39; Doc. 101
at 23-25, so to decide whether the NHL was Boogaard's custodian, the court would have to
interpret the CBA. For instance, as explained above, the Prescription Medication Program, in

conjunction with Article 30.3, arguably could be read to divest the NHL of the authority to control players' medical treatment. Doc. 10-2 at 146; Doc. 101-1 at 13-28. In fact, the NHL plausibly asserts that it could not even control the welfare of players enrolled in the SABH Program; the agreement creating the SABH Program provided that "program doctors," selected by both the NHL *and* the NHLPA, would direct and monitor the care of players struggling with substance abuse. Doc. 10-3 at 3-4 ("The [SABH] program will be administered by qualified doctors selected by the League and the NHLPA …."); Doc. 44 at 18. And, as also explained above, the parties contest the extent to which the NHL could change the rules of play to further discourage fighting, which bore directly on Boogaard's daily welfare. Doc. 44 at 36; Doc. 101 at 23-24. Accordingly, whether the NHL was Boogaard's custodian for purposes of Counts I and II depends largely on genuinely contested interpretations of the CBA, which means that those counts are completely preempted. *See Wis. Cent.*, 539 F.3d at 758.

Boogaard cites a raft of decisions ostensibly showing that his claims are not preempted. Those decisions differ from this case in a crucial respect, for in none was it necessary to interpret a collective bargaining agreement to ascertain the scope of the defendant's duty. In *Bentley v. Cleveland Browns Football Co.*, 958 N.E.2d 585 (Ohio App. 2011), the plaintiff was a professional football player who tore a tendon in his knee. While he was rehabilitating in a training facility owned by the team, he contracted a staph infection. He sued the team for fraud and negligent misrepresentation, based the team's statements that the facility was "world class" and had a "strong track record." *Id*. at 587. The state appellate court held that the plaintiff's state law claims were not preempted. *Id*. at 590. As the court reasoned, there was no need to interpret the collective bargaining agreement to determine whether the team had a duty not to tell deliberate and material falsehoods because, as in *Lingle*, Ohio law imposed that particular duty

18

on everyone, independent of any collective bargaining agreement. *See id*. at 588-89; *see also Jurevicius v. Cleveland Browns Football Co.*, 2010 WL 8461220, at *13 (N.D. Ohio Mar. 31, 2010) (holding, in a similar case involving a suit by a player against the same team arising out of a staph infection, that the negligence claims were not preempted because "Ohio case law provides that an owner or operator of a facility has the duty to warn of certain hazardous conditions," and the plaintiff's claim required the court to determine only whether the team breached that independent duty).

Boogaard also cites *Hendy v. Losse*, 925 F.2d 1470, 1991 WL 17230 (9th Cir. 1991) (unpublished disposition), where a former professional football player sued a team doctor for negligently treating the player's knee injury and the team for negligently hiring the doctor. The Ninth Circuit held that the claim against the team was not preempted. Unlike here, in *Hendy* there was no doubt that the team, as the plaintiff's employer, owed him a duty separate and apart from the collective bargaining agreement, as "[t]he duty to use due care in the hiring and retention of employees arises from state law." *Id*. at *2.

Boogaard next cites *Green v. Arizona Cardinals Football Club LLC*, 21 F. Supp. 3d 1020 (E.D. Mo. 2014), where retired professional football players sued their former team for failing to protect them from concussions and for neglecting to warn them about the long-term health risks posed by concussions. The district court held that § 301 did not preempt the players' state law negligence and failure-to-warn claims, relying, as in *Hendy*, on the team's status as the plaintiffs' employer. The court reasoned that "Plaintiffs' negligence claims [were] premised upon the common law duties to maintain a safe working environment, not to expose employees to unreasonable risks of harm, and to warn employees about the existence of dangers of which they could not reasonably be expected to be aware"; as such, the court would have no need to analyze

19

the NFL's collective bargaining agreement to determine whether the team had a duty to the players or what the duty required of it. *Id*. at 1027.

The remaining cases that Boogaard cites involve the even less controversial duty not to unreasonably harm other people. *See McPherson v. Tenn. Football Inc.*, 2007 U.S. Dist. LEXIS 39595, at *22 (M.D. Tenn. May 31, 2007) (holding that a claim against an NFL team for injuries the plaintiff suffered when the team's employee hit the plaintiff with a golf cart during a halftime show was not preempted); *Stringer v. Nat'l Football League*, 474 F. Supp. 2d 894, 912 (S.D. Ohio 2007) (holding that a claim against the NFL for mandating the use of dangerous equipment was not preempted); *Brown v. Nat'l Football League*, 219 F. Supp. 2d 372 (S.D.N.Y. 2002) (remanding a claim against the NFL for injuries the plaintiff suffered when a referee, an NFL employee, hit the plaintiff in the eye with a heavy penalty flag). None of the cited cases involved claims, like Boogaard's, alleging breach of a voluntarily assumed duty (Counts III through VIII) or a free-floating duty to act (Counts I and II) in a manner that would require interpretation of a collective bargaining agreement.

So Boogaard's purported state law claims are completely preempted by § 301 of the LMRA. Completely preempted claims are not automatically dismissed, but rather generally are treated as if they alleged breach of a collective bargaining agreement in violation of § 301. *See Int'l Bhd. of Elec. Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 863 (1987) (analyzing a completely preempted state law claim as if it were a claim under § 301); *Healy v. Metro. Pier and Exposition Auth.*, 804 F.3d 836, 840 (7th Cir. 2015) ("Here, § 301 preempts the state law tortious interference claim and converts it into a § 301 claim."); *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 501 (7th Cir. 1996) (observing that, because a preempted claim actually "arose under § 301, it is considered a suit for breach of the CBA"); *Brazinski v. Amoco*

*Petroleum Additives Co.*, 6 F.3d 1176, 1180 (7th Cir. 1993) ("[I]f the plaintiff's claim, ostensibly based on state law, cannot be adjudicated without interpretation of the collective bargaining agreement, the claim turns into a federal claim that the agreement itself has been violated."); *Douglas v. Am. Info. Techs. Corp.*, 877 F.2d 565, 573-74 (7th Cir. 1989) ("Because we have determined that Ms. Douglas' claim for intentional infliction of emotional distress is preempted by section 301, we must now determine whether the district court correctly dismissed the claim for failure to exhaust grievance and arbitration remedies available under the collective bargaining agreement.").  But Boogaard has no viable § 301 claim.

Collective bargaining agreements often provide that the parties must resolve disputes about the agreement through arbitration.  When they do, an employee generally may not first bring suit in federal court to enforce the agreement; instead, his union must pursue the claim on his behalf using the agreement's dispute resolution procedures.  *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965) ("As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress."); *Olson v. Bemis Co.*, 800 F.3d 296, 303 (7th Cir. 2015); *Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 803-04 (7th Cir. 2008); *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 908 (7th Cir. 2008); *Fulk v. United Transp. Union*, 108 F.3d 113, 116 (7th Cir. 1997).  However, if the union either decides not to pursue a grievance or pursues a grievance and loses, the employee may bring suit in federal court alleging both that the union breached its duty of fair representation and that the employer breached the collective bargaining agreement, in what is called a "hybrid contract/duty-of-fair-representation claim."  *Cunningham v. Air Line Pilots*

*Ass'n, Int'l*, 769 F.3d 539, 541 (7th Cir. 2014); *see also DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163-65 (1983); *Vaca v. Sipes*, 386 U.S. 171, 186 (1967); *Olson*, 800 F.3d at 303.

Article 17 of the 2005 CBA required all "dispute[s] involving the interpretation or application of, or compliance with, any provision of" the CBA to be resolved through arbitration, Doc. 10-2 at 108, so Boogaard's claims can survive only as hybrid claims. *See Olson*, 800 F.3d at 303 (noting that if a dispute implicating a collective bargaining agreement is subject to mandatory arbitration, the plaintiff "must file a hybrid § 301 suit"). Hybrid claims are subject to a six-month limitations period, beginning either when the arbitrator rules against the union or when the employee reasonably should learn of the union's decision not to pursue a grievance. *See DelCostello*, 462 U.S. at 169-71; *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 914 (7th Cir. 1999); *Bonds v. Coca-Cola Co.*, 806 F.2d 1324, 1326 (7th Cir. 1986); *Freeman v. Local Union No. 135, Chauffeurs, Teamsters, Warehousemen and Helpers*, 746 F.2d 1316, 1319 (7th Cir. 1984); *Metz v. Tootsie Roll Indus., Inc.*, 715 F.2d 299, 303 (7th Cir. 1983).

In contending that Boogaard's hybrid claims are untimely, the NHL cites *Boogard v. Nat'l Hockey League Players Ass'n*, *supra*, the opinion that dismissed Boogaard's earlier suit against the NHLPA. Doc. 44 at 39-40. After Boogaard died, the New York Rangers decided not to pay his estate the amount remaining on his contract. The NHLPA elected not to pursue a grievance, and Boogaard's estate sued the NHLPA in California federal court for breaching its duty of fair representation. *Boogard*, 2013 WL 1164301, at *2. The court held that the claims were untimely because the estate did not file its complaint against the NHLPA until roughly nine months after the NHLPA notified the estate of its decision not to pursue a grievance and because there was no reason to equitably toll the limitations period. *Id.* at *3-5.

22

The NHL submits that the California federal court's judgment precludes Boogaard from arguing that his hybrid claims against the NHL comply with the statute of limitations. Doc. 44 at 39-40. That is doubtful. A judgment precludes a party from pressing an issue in a later case only if the earlier court necessarily decided the issue. *See Bobby v. Bies*, 556 U.S. 825, 834 (2009) ("If a judgment does not depend on a given determination, relitigation of that determination is not precluded."); *Carter v. AMC, LLC*, 645 F.3d 840, 842 (7th Cir. 2011). The earlier suit dealt with a separate concern—the Rangers' failure to pay on Boogaard's contract, as opposed to the NHL's alleged negligence—and hybrid claims based on different harms can accrue at different times. *See Connor v. Elmhurst Dairy, Inc.*, 2015 WL 5159185, at *5 (E.D.N.Y. Aug. 17, 2015) ("That an employee has multiple underpinnings for his duty of fair representation claims does not mean that all of the claims accrue at the same time or relate backward (or forward) to any one particular point in time.").

Although Boogaard is not *precluded* from arguing that his § 301 claims are timely, he has not actually *made* that argument, either in his response brief or surreply brief. Docs. 101, 118. Boogaard accordingly has forfeited any argument that his claims are timely. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a

23

specific point in support of a general argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted); *Salas v. Wis. Dep't of Corrs.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment.").

Boogaard's claims almost certainly are time barred in any event. The 2005 CBA required the NHLPA to file a grievance within sixty days "from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the Grievance," Doc. 10-2 at 108, and, as explained above, Boogaard's representative would have had to file this suit within six months of learning that the NHLPA would not pursue a grievance. This suit was filed nearly two years after Boogaard's death. Doc. 1-1 at 55. There is no indication in the record that the NHLPA pursued a grievance related to these claims, and it is inconceivable that Boogaard's representatives did not learn about the NHLPA's decision not to pursue a grievance until nearly a year and a half after his death.

### Conclusion

For the foregoing reasons, the NHL's summary judgment motion is granted. The NHL is entitled to judgment on all counts (I through VIII) of the amended complaint. The only remaining matter is Boogaard's motion for leave to file a second amended complaint. Doc. 135. Boogaard's brief in support of that motion argues that the amendment is timely and that the proposed amended claims are not completely preempted by § 301 of the LMRA (and thus not

futile).  Doc. 132.  The NHL shall respond to the motion by January 15, 2016, and Boogaard shall reply by January 29, 2016.

December 18, 2015                            _____

                                                         United States District Judge